FILED
CLERK
2/9/2016 4:15 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
SUPERIOR SITE WORK, INC., DIVERSIFIED
CONSTRUCTION CORP. and HARRISON
AVENUE PROPERTIES LLC,
                Plaintiffs,

        -against-

NASDI, LLC,
                Defendant.
----------------------------------------------------------X

**MEMORANDUM OF DECISION & ORDER**
14-cv-1061 (ADS) (SIL)

**APPEARANCES:**

**Zabell & Associates, P.C.**
*Attorneys for the Plaintiffs*
1 Corporate Drive, Suite 103
Bohemia, NY 11716
      By: Saul D. Zabell, Esq., Of Counsel

**John E. Osbourne P.C.**
*Attorneys for the Defendant*
841 Broadway, Suite 500
New York, NY 10003
      By: Dana Hamilton Crow, Esq., Of Counsel

**SPATT, District Judge**.

      This cases arises from allegations that the Defendant NASDI, LLC ("NASDI"), a general contractor hired to construct an athletic facility in Staten Island (the "Project") by the New York City Department of Parks and Recreation ("DPR"), breached (i) a subcontract with the Plaintiff Superior Site Work, Inc. ("Superior" or "Subcontractor") to perform construction services on the Project (the "Subcontract"); (ii) an oral agreement with the Plaintiff Diversified Construction Corp. ("Diversified"), a subsidiary of Superior, for commissions in exchange for negotiating with other subcontractors to perform services on the Project for lower prices; and (iii) a lease agreement with the Plaintiff Harrison Avenue Properties, LLC ("Harrison") to rent office space.

1

On February 19, 2014, Superior, Diversified, and Harrison (collectively, the "Plaintiffs") filed a complaint which asserted four common law claims against NADSI for (i) breach of contract; (ii) conversion; (iii) fraud in the inducement; and (iv) unjust enrichment. In addition, the original complaint named Travelers Casualty and Surety Company of America ("Travelers") as a Defendant and asserted allegations suggesting that Travelers was liable as a surety under a bond it issued to NASDI. However, the original complaint did not assert any claims against Travelers.

On April 30, 2014, NASDI filed a motion pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) to dismiss the complaint in its entirety. Also on April 30, 2014, Travelers filed a separate motion to dismiss the complaint as against it even though the Plaintiffs failed to allege a claim against Travelers.

On May 20, 2014, the Plaintiff filed an amended complaint which added a fifth cause of action against Travelers for "suretyship" (the "FAC").

On March 14, 2015, the Court rendered a decision (the "March 15, 2015" Order") (i) dismissing without prejudice Superior's claim against NASDI for breach of contract; (ii) dismissing without prejudice Diversified's breach of contract claim against NASDI; (iii) denying NASDI's motion to dismiss Harrison's breach of contract claim; (iv) dismissing with prejudice Superior's claim against NASDI for unjust enrichment; (v) denying NASDI's motion to dismiss the unjust enrichment claims asserted by Diversified and Harrison; (vi) dismissing with prejudice the Plaintiffs' claim against NASDI for conversion; and (vii) dismissing with prejudice the Plaintiffs' "suretyship" claim against Travelers.

Thus, the only remaining claims were (i) Diversified's unjust enrichment claim against NASDI; and (ii) Harrison's breach of contract and unjust enrichment claims against NASDI.

On April 13, 2015, the Plaintiffs timely filed a second amended complaint ("SAC") which added new allegations to the previously dismissed breach of contract claims asserted by Superior and Diversified against NASDI.

Presently before the Court is NASDI's second motion pursuant to Fed. R. Civ. P. 12(b)(6) to partially dismiss Superior's breach of contract claim.

For the reasons set forth below, the Court denies NASDI's partial motion to dismiss.

## I. DISCUSSION

The Court assumes familiarity with the Subcontract and the relevant background set forth in the March 14, 2015 Order and need not re-state the same alleged facts here. Accordingly, the Court will proceed directly to the relevant legal standards and the parties' legal positions.

### A. The Legal Standards

In considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court generally "'accept[s] all allegations in the complaint as true and draw all inferences in the non-moving party's favor.'" LaFaro v. New York Cardiothoracic Grp., PLLC, 570 F.3d 471, 475 (2d Cir. 2009) (quoting Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003)). However, a complaint must plead "enough facts to state a claim to relief that is plausible on its face" to survive a 12(b)(6) motion to dismiss. Bell Atl. Corp. v. Twomly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). In particular, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." Id.; see also Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ("[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice.") (citation omitted); Luna v. N. Babylon Teacher's Org., 11 F. Supp. 3d 396, 401 (E.D.N.Y. Apr. 7, 2014) ("Conclusory allegations of legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss.") (citing Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006)).

The parties' briefs assume New York law applies to Superior's breach of contract claim, and the Subcontract contains a New York choice of law provision. (See the March 15, 2014 Order at 12–13); see also Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003) ("'New York courts generally defer to the choice of law made by the parties to a contract . . . New York law allows a court to disregard the parties' choice when 'the most significant contacts' with the matter in dispute are in another state.'") (quoting Cargill, Inc. v. Charles Kowsky Res., Inc., 949 F.2d 51, 55 (2d Cir. 1991)). Accordingly, the Court will apply New York law to Superior's breach of contract claim.

> Under New York law:
>
> In order to state a claim of breach of contract, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of the defendant to perform; and (iv) damages." Johnson v. Nextel Comm'ns. Inc., 660 F.3d 131, 142 (2d Cir. 2011) (citing Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004))[.]

(The March 14, 2015 Order at 14.)

**B. As to Superior's Breach of Contract Claim**

In the FAC, Superior asserted that NASDI breached the Subcontract for failing to pay Superior for the following expenses: "(i) $476,541.39 for "work completed pursuant to the [Subcontract] and successive Change Orders"; (ii) $47,320.39 for "service and materials, and/or costs properly incurred and chargeable in further of" its performance; (iii) $298,855.01 for

4

"multiple Change Orders [that] have been submitted to [DPR]"; and (iv) $1,534,952.21 for damages caused by the "delayed acceptance of augur case piles by [DPR]."

In the March 14, 2015 Order, the Court dismissed without prejudice Superior's breach of contract claim because although there was no dispute as to the existence of the Subcontract, the FAC failed to point to a "specific provision [of the Subcontract] that would give it the right to receive these payments under the Subcontract." (The March 14, 2015 Order at 14.) The Court found Superior's failure to do so to be fatal to its claim, "especially where, as here, the Subcontract provides for a complicated set of structured payments." (Id. at 16.)

The SAC purports to cure the deficiencies in the FAC by adding block quotes from certain sections of the Subcontract and additional allegations under the heading of one single breach of contract cause of action.

However, for the purpose of clarity, the Court will construe the SAC as essentially asserting five separate breach of contract claims: (i) NASDI breached the Subcontract by refusing to pay Superior $132,408.06 "for service, materials, and/or costs properly incurred in furtherance of the [Subcontract] and successive Change Orders," see SAC at ¶¶ 19–27; (ii) NASDI breached the Subcontract by allegedly refusing to pay Superior $752,469.89 for extra work performed by Superior pursuant to "multiple change orders," see SAC at ¶¶ 28–32; (iii) NASDI breached the Subcontract by refusing to pay Superior for $ 1,534,952.51 in additional expenses it incurred as a result of DPR's delay in approving certain materials that were necessary to Superior's performance, see SAC at ¶¶ 33–35; (iv) NASDI breached an oral agreement with Diversified for failing to pay Diversified certain commissions that it allegedly earned by negotiating agreements with other sub-contractors to perform work on the Project for lower

5

prices; and (v) NASDI breached a lease agreement with Harrison by failing to pay its agreed upon monthly rental rate for thirty-two months.

In its present motion, NASDI seeks to dismiss the first three breach of contract claims asserted by Superior. The Court will now address the viability of these claims.

**1. As to "Services and Materials"**

As noted, the SAC alleges that NASDI breached the Subcontract by refusing to pay Superior $132,408.06 "for services, materials, and/or costs properly incurred in furtherance of the [Subcontract]."

Under the terms of the Subcontract, NASDI agreed to pay Superior an estimated total sum of $4,890,365. (December 16, 2010 Subcontract, Zabell Decl., Ex. B (the "Subcontract"), at § 5.1; see also Schedule at § 5.1.) However, the "final contract price [was] to be determined based on the actual quantities installed for each respective item." (See Subcontract Schedule at § 5.1.)

Further, the Subcontract provided for a structured set of "Progress Payments," which were to be made by NASDI to Superior on a monthly basis. (See Subcontract at § 5.3.) Specifically, on the 25th day of every month, the Subcontract required Superior to submit "a written requisition for payment complete with sufficient breakdown data to permit checking and approval, and in a form acceptable to NASDI showing the proportion of the Work completed to that date." (Id. at § 5.2; see also Subcontract Schedule at § 5.2.)

In addition, every week, Superior was required to provide an "itemized list" of its "labor and material costs" for "verification by NASDI." (See Subcontract at § 3.3; Subcontract Schedule at § 5.2.) In turn, NASDI was required to "fund [Superior] on a weekly basis for all labor and material expenditures." (Subcontract Schedule at § 5.2.) However, "[a]ll monies

6

advanced to [Superior] by NASDI [were to] be deducted off the approved [Superior] payment application for that period." (Id.)

Once the application for the monthly Progress Payment was submitted to NASDI, NASDI deducted from it (i) "a reserve amount equal to the amount withheld by [DPR] for the Subcontractor's Work"; (ii) "all previous payments"; and (iii) a "retention" reserve equal to 5% of the amount requested. (Subcontract at § 5.3; Subcontract Schedule at § 5.3.)

Further, the Subcontract stated:

> The balance of the amount of said requisition, when approved by NASDI and/or [DPR], shall be paid to Subcontractor within ten (10) days of NASDI's receipt of payments from [DPR]. The Subcontractor understand and agrees that [DPR's] payment to NASDI is a condition precedent to NASDI's obligation to pay the Subcontractor.

(Subcontract at § 5.3.)

In addition, Section 5.8 of the Subcontract stated that NASDI "may" withhold Progress Payments and the Final Payment to Superior on a number of grounds, including:

> defective work not remedied, claims filed, reasonable evidence indicating probability of filing of claims, failure of Subcontractor to make payments properly to its Sub-subcontractors . . . , reasonable doubt that work can be completed for the balance then unpaid, damage to NASDI, other subcontractors, [DPR] or the public, reasonable belief that Subcontractor will be unable to maintain the Project schedule, . . . or for any other breach of this Subcontract.

(Id. at § 5.8.)

Final payment to Superior was to be "the unpaid balance of the Subcontract amount." The final payment was also subject to a number of "conditions precedent," including:

> (i) "Superior fully completed the Work described in the Subcontract";
>
> (ii) the Work is "satisfactory to and approved by [DPR], Architect, and NASDI";
>
> (iii) "delivery to NASDI of all manuals, 'as-built' drawings, guarantees, and warranties for material and equipment furnished by Subcontractor";

(iv) "receipt of Final Payment for Subcontractors [sic] Work by NASDI from owner";

(v) "furnishing to NASDI of satisfactory evidence by Subcontractor that all labor, applicable taxes, fees and fringe benefits, and material accounts incurred by Subcontractor in connection with Work have been paid in full";

(vi) "furnishing to NASDI a completed Affidavit Release of Lien and Waiver of Claim by Subcontractor and any Sub-subcontractors in a form satisfactory to NASDI"; and

(vii) "an agreement holding NASDI and [DPR] free and harmless from any and all claims arising out of or in connection with this Subcontract and in compliance with any other requirement of the Prime Contract."

(Id. at §§ 5.9, 5.10.)

The SAC alleges that Superior complied "with these sections of the [Subcontract]" and "submitted written requests for payment complete with sufficient itemized lists of weekly labor and material expenditures to Defendant NASDI." (SAC at ¶¶ 23, 24.) The SAC further alleges that Superior breached Sections 5.2 and 5.3 of the Subcontract because NASDI "refused to pay Plaintiff Superior [$132,408.06] for service and materials, and/or costs properly incurred and chargeable in further of the [Subcontract]." (Id. at ¶ 19.) According to the SAC, the $132,408.06 includes: (i) $7,492.18 for "raw material charges"; (ii) $22,350 for a "back-charge for pre-cast planking lay-out"; (iii) "$20,000 for fueling of Defendant NASDI's equipment"; and (iv) $82,585 for "crane usage." (Id.) By the Court's computation, these charges add up to $132,427.18, which is slightly more than the $132,408.06 that the SAC claims is the total amount sought by Superior for its "services and materials."

Despite Superior's inaccurate math, the Court finds that the SAC adequately alleges a breach of contract claim for $132,408.06 in "services and materials."

There is no dispute as to the first element — namely, that the parties agreed to and are bound by the Subcontract. In addition, the SAC alleges that Superior complied with the

8

conditions in Section 5.2 by submitting the "written requests for payment complete with sufficient itemized lists of weekly labor and material expenditures to Defendant NASDI." (SAC at ¶¶ 23, 24.) Finally, the third and fourth elements of a breach of contract claim — namely, that NASDI breached the Subcontract and that Superior suffered damages as result of the breach — are satisfied because the SAC alleges that NASDI refused to pay Superior for $132,408 in "services and materials" that it was allegedly entitled to receive under the Subcontract. (See id. at ¶ 19.)

The Court acknowledges that it is not entirely clear whether Superior is entitled to be reimbursed for all of the "services and materials" it seeks under the Subcontract. As the Court made clear in its March 14, 2015 Order, while NASDI must provide Superior with weekly funds for the "labor and material expenditures," those expenses are later deducted by NASDI from any Progress or Final Payments made to Superior. (See Subcontract Schedule at § 5.3; see also March 14, 2015 Order at 17.)

Therefore, if there is evidence produced in discovery that shows the $132,408 Superior seeks **are** "service and materials" related to "labor and material expenditures," then NASDI did nothing improper by deducting those expenses from its monthly Progress Payments to Superior.

However, the Court cannot resolve such a question without making factual determinations that are improper at this early stage of the litigation. Accordingly, construing the allegations in the SAC as true, the Court finds that Superior has plausibly alleged that NASDI breached the contract by failing to pay Superior $132,408 for "service and materials" under Section 5 of the Subcontract.

Nevertheless, NASDI asserts that Superior's claim fails because the SAC does not "even generally allege compliance with [the] Subcontract section 6.2, 6.4, or 6.6." (The Def.'s Opp'n Mem. of Law at 8.) The Court disagrees for two reasons.

First, Section 6 of the Subcontract, described in more detail below, sets forth the process that Superior must follow in order to be compensated for extra work directed by NASDI or DPR pursuant to written "change orders." (See Subcontract at § 6.2–6.4.) The SAC alleges that NASDI refused to pay Superior $132,408.06 "for service and materials and/or costs properly incurred and chargeable in furtherance of the Contract and successive Change Orders under Sections 6.4, 6.6, 6.7 of the [Subcontract]." (SAC at ¶ 19.) The SAC goes on to quote extensively from Section 5 of the Subcontract relating to NASDI's obligation to pay Superior Progress Payments and the Final Payment and asserts that NASDI breached these provisions by refusing to pay Superior for "these services and materials." (See id. at ¶¶ 20–25.)

Although this section of the SAC is not a model of clarity, the Court finds it reasonable to read these allegations to suggest that at least some of the $132,408.06 that NASDI allegedly refused to pay Superior related to the monthly Progress Payments for the regular "Work" defined by Section 5 and Rider A of the Subcontract and not to "extra work" performed pursuant to Section 6. Thus, the conditions precedent set forth in Section 6 for "extra work" do not appear to apply to all of the $132,408.06 in damages sought by Superior and therefore, cannot, at this stage of the litigation, provide a basis for dismissing Superior's breach of contract claim.

Second, Superior does allege that it generally complied with the "contractual obligations for payment" as set forth in Section 6 of the Subcontract. (See SAC at ¶ 28.)

Fed. R. Civ. P. 9(c) states, "In pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed." Although there is

10

scant binding case law in this Circuit regarding Fed. R. Civ. P. 9(c), most district courts have interpreted the rule to require, at most, a "general averment to the satisfaction of any conditions precedent." See In re Residential Capital, LLC, 524 B.R. 563, 584 (Bankr. S.D.N.Y. 2015) ("Courts in the Second Circuit are largely in agreement that 'a general allegation that all conditions precedent have been met ... is sufficient to satisfy Rule 9(c).'") (quoting Beautiful Home Textiles (USA), Inc. v. Burlington Coat Factory Warehouse Corp., No. 13 Civ. 1725 (LGS), 2013 WL 3835191, at *3 (S.D.N.Y. July 25, 2013)); Mendez v. Bank of Am. Home Loans Servicing, LP, 840 F. Supp. 2d 639, 648 (E.D.N.Y. 2012) (Spatt, J) ("[I]t is clear that even where courts require allegations in the complaint with regard to the satisfaction of conditions precedent, courts have consistently accepted only general averments of their fulfillment."); Cohen v. LTF Real Estate Co., No. 08-CV-4591 (JTB) (ARL), 2009 WL 1373542, at *4 (E.D.N.Y. May 15, 2009) ("The complaint alleges that Cohen 'has fully performed all covenants and conditions precedent to be performed on his part under the terms of the Agreement.' . . . Although LTF does not believe that there is evidence to support that allegation, there is no basis for dismissing the claim at this juncture as a matter of law.").

Accordingly, even if the conditions set forth in Section 6 are applicable to Superior's breach claim for $132,408.06 in "services and materials," the Court finds that the general allegation contained in the SAC that Superior complied with the requirements of Sections 6 is sufficient to satisfy Rule 9(c) and survive a Rule 12(b)(6) motion to dismiss.

In sum, the Court finds that Superior has sufficiently alleged a breach of contract claim arising from NASDI's alleged refusal to pay Superior $132,408.06 for "services and materials."

**2. As to "Extra Work"**

The SAC also asserts that NASDI breached the Subcontract by failing to compensate Superior for extra work that Superior allegedly performed pursuant to "multiple Change Orders." (See SAC at ¶ 28.)

The scope of the work to be performed by Superior under the Subcontract is defined by the Schedule to the Subcontract and the specifications provided by NASDI, DPR, and the engineer and architect appointed by DPR. (See Subcontract at § 1.1.)

However, as the Court noted in its March 14, 2015 Order, the Subcontract provides NASDI with the ability to "make changes in, additions to and deletions from the Work to be performed under th[e] Subcontract." (Id. at § 6.1) To that end, the Subcontract states that no changes to the scope of the Work or the contract price can be made "except on the prior written order of NASDI" which indicates that NASDI "approve[s] and accept[s]" the proposed changes. (Id. at § 6.2.)

The Subcontract further specifies:

> For changes directed by NASDI, which NASDI agrees that the extra work is compensated[,] [Superior] shall be entitled to an adjustment in the Subcontract price, provided [Superior] gives NASDI written notice within five (5) days and shall submit the actual Change Order Request within ten (10) days after receipt of the proposed instruction, and prior to performing such changed work. Failure to provide such notice shall be deemed to prejudice NASDI's rights and to constitute a waiver of such claims by [Superior].

(Id. at § 6.4.)

The Subcontract states that if the parties disagree "as to what constitutes extra work or additional work or the payment therefor, . . . [Superior] shall proceed with such work after making a written request for a change order and shall keep an accurate account of all field costs thereof and may pursue his claim pursuant to this Subcontract." (Id. at § 6.8.)

12

The SAC alleges that "[the] Plaintiff Superior and Defendant NASDI entered into several binding and enforceable Subcontract Change Order agreements" and as a result, the original Subcontract price of $4,890,365 was allegedly revised to $8,115,961. (SAC at ¶ 12, 14, 15.) Although Superior has completed "all aspects of work" on the Project, NASDI has allegedly only paid Superior $5,185,505.68. (See SAC at ¶¶ 17, 18.)

Separately, the SAC alleges that Superior submitted "multiple Change Orders" to DPR for the following amounts: (i) $22,050.60 for "Open Time and Material Change Orders"; (ii) $150,000 for "Pile Cap and Grade Beam Reports"; (iii) $153,870.09 for "Open Concrete PSI Upgrade Change Orders"; (iv) $74,359.94 for "Rebar Parking Lot"; (v) $176,372 for "Rebar Slab on Grade"; and (vi) $175,817.26 for "Grade Beam Through Pile Cap." This, according to the SAC's math, amounts to a total of $752,469.89. (SAC at ¶ 28.) Here too, the SAC alleges that NASDI breached the Subcontract by refusing to compensate Superior for the $752,469.89 of work it allegedly performed pursuant to the "multiple Change Orders" that it submitted to DPR. (Id. at ¶¶ 28, 32.)

The Court finds that the SAC adequately alleges the elements of a breach contract claim. As noted, the parties do not dispute the first element of a breach of contract claim, the existence of the Subcontract.

Further, the SAC alleges that Superior submitted written Change Order Requests to NASDI in compliance with its obligations under Section 6 of the Agreement; that NASDI approved those requests; and as a result, the total Subcontract price increased from $4,890,365 to $8,115,961. It further alleges that Superior performed all aspects of the work that formed the basis of the Change Order Requests. Construing these allegations as true, the Court finds that

13

Superior has adequately pled that it performed its obligations under the Subcontract and therefore, the second element of a breach of contract claim is satisfied.

In addition, the third and fourth elements of a breach of contract claim — i.e., NASDI's breach and damages to Superior — are also satisfied because the SAC alleges that NASDI refused to pay Superior for the services it performed on the Project pursuant to the allegedly valid Change Orders Requests approved by NASDI.

In its present motion, NASDI asserts that Superior's breach claim arising from work performed pursuant to the Change Orders fails because the SAC "does not even generally allege compliance with the requirements of Section 6.3 of the Subcontract." (The Def.'s Mem. of Law at 8–9.) The Court disagrees.

First, it is not entirely clear whether the conditions set forth in Section 6.3 are applicable to Superior's claim. Section 6.3 only applies to "changes in the Prime Contract that have been initiated by [DPR], for acts or omissions of DPR and for defects in the Prime Contract." (Subcontract at § 6.3.) Although the SAC alleges that it submitted $752,469.89 in Change Order Requests to DPR, it does not allege that those requests were initiated by DPR or were made in response to acts, omissions, or defects caused by DPR. Further, elsewhere in the SAC, the Plaintiffs allege that Superior performed work pursuant to Change Orders under "Sections 6.4, 6.6, and 6.7," which relate to requests made by NASDI, not DPR. Thus, Section 6.3 may not apply to this case.

Second, even if Section 6.3 is applicable to Superior's breach claim, the SAC sufficiently alleges that Superior satisfied the conditions precedent to receiving payment for its work under that provision.

Section 6.3 states that in order for Superior to be compensated for extra work initiated by DPR: (i) Superior must first provide NASDI with written notice of the requested changes "in sufficient time and form to allow NASDI to process such claims within the time and . . . in accordance the applicable provisions of the Prime Contract [between Superior and DPR]"; (ii) Superior must then obtain a "written change order" from NASDI approving of the changes to the Subcontract price; and (iii) DPR must pay NASDI for the costs associated with Superior's extra work. (Id. at § 6.3.)

In their opposition memorandum, the Plaintiffs assert that the SAC sufficiently pleads that Superior satisfied the three requirements set forth in Section 6.3 because the SAC states that "[the] Plaintiff Superior . . . complied with Section 3.3, 6.3 and 10.2 of the Subcontract by submitting written requests for payment complete with itemized lists of weekly labor and material expenditures to Defendant NASDI." (See the Pls.' Opp'n Mem. of Law at 11–12 ; see also SAC at ¶¶ 36–37.) In addition, they contend that the third requirement set forth in Section 6.3 — namely, that DPR must first pay NASDI before Superior can receive compensation for its extra work — is a "[p]ay-[w]hen-[p]aid," which the New York Court of Appeals has held is unenforceable as a matter of New York policy. (See the Pls.' Opp'n Mem. of Law at 13–15.)

The Court agrees with the Plaintiffs' first contention and therefore need not reach the question of whether Section 6.3 includes a "pay-when-paid" clause that is unenforceable under New York law. As noted above, it is not clear that a plaintiff is required to plead the satisfaction of conditions precedent to survive a Rule 12(b)(6) motion to dismiss. For the courts that do impose such a requirement, they have repeatedly found general allegations that the plaintiff satisfied the condition precedent to be sufficient. See DiCroce v. Wells Fargo Bank, N.A., No. 13-CV-1768 (SLT)(RLM), 2014 WL 4904458, at *6 (E.D.N.Y. Sept. 30, 2014) ("Even assuming

15

that notification is a condition precedent, however, the Bank's arguments with respect to the first cause of action are unpersuasive. First, Plaintiff is not required to specifically allege in the Complaint that she notified Wells Fargo of damage to the Property. Rule 9(c) of the Federal Rules of Civil Procedure provides: 'In pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed. But when denying that a condition precedent has occurred or been performed, a party must do so with particularity.' Fed. R. Civ. P. 9(c). Accordingly, it is clear that Plaintiff did not have to plead that she performed conditions precedent with any specificity."); Jeda Capital-56, LLC v. Lowe's Home Centers, Inc., No. 5:12-CV-419 (LEK) (DEP), 2013 WL 5464647, at *5 (N.D.N.Y. Sept. 30, 2013) ("Accordingly, to the extent completion of the water tower 'to the satisfaction of Lowe's' is a condition precedent to Lowe's obligation to release the Water Tower Funds, JEDA need only generally aver such satisfaction."); Metra Indus., Inc. v. Rivanna Water & Sewer Auth., Inc., No. 3:12CV00049, 2013 WL 596064, at *3 (W.D. Va. Feb. 15, 2013) ("Metra's amended complaint . . . . affirmatively states that '[a]ny and all applicable and enforceable conditions precedent under [Contracts A and B] and applicable law to . . . commencing this action have occurred or been performed.' . . . . The court is convinced that such allegations are sufficient to satisfy Rule 9(c)'s liberal pleading standard and, thus, withstand a motion to dismiss.").

Therefore, to the extent that the requirements set forth in Section 6.3 are conditions precedent applicable to Superior's breach claim, the Court finds that the general allegation that it satisfied Section 6.3 to be sufficient at this motion to dismiss stage of the litigation.

Accordingly, the Court denies NASDI's motion to dismiss Superior's claim that NASDI breached the Subcontract by failing to pay Superior for work performed pursuant to Change Order Requests approved by NASDI.

### 3. As to the Alleged Delay Expenses

The FAC asserted that Superior was entitled to $1,534,952.21 for expenses that it incurred due to the "the delayed acceptance of augur case piles by [DPR]." (FAC at ¶ 22.)

In the March 14, 2015 Order, the Court found that this allegation, without more, was not sufficient to state a breach of contract claim because the Plaintiffs did not point to any provision of the Subcontract which made NASDI responsible for delays caused by DPR. In addition, the Court noted that:

> The only provision that refers to obligations by NASDI to pay for expenses associated with the actions of DPR are Sections 10.2 and 10.5. Those sections provide that NASDI has an obligation to reimburse Superior for 'all costs incurred[,] including attorneys' fees, in passing claim[s]' onto DPR arising from 'contractual benefits that may be claimable on behalf of [Superior].' Superior does not point to any sections that refer to the 'delay expenses' sought by Superior in the amended complaint. Thus, the only plausible conclusion appears to be that NASDI did not have an obligation to pay for such expenses.

(The March 14, 2015 Order at 17–18.)

The SAC attempts to cure the deficiencies identified by the Court in the March 14, 2015 Order by asserting that Sections 3.3, 6.3, 6.4, 6.6, and 10.2 of the Subcontract provide a basis for NASDI to be held liable for the alleged omissions of DPR. (See SAC at ¶ 35.)

In its present motion, NASDI asserts that Superior's breach of contract claim arising from its refusal to pay costs associated with DPR's delays still fails as a matter of law because "[t]here is no provision in the Subcontract which makes NASDI responsible for delays caused by [DPR]." (The Def.'s Mem. of Law at 9–10.)

The Subcontract is somewhat unclear on this question. As noted above, Section 6.3 states that Superior may seek an upward adjustment of the Subcontract price from NASDI "[f]or changes in the Prime Contract that have been initiated by [DPR], <u>for acts or omissions of the [DPR]</u> and for defects in the Prime Contract." (Subcontract at § 6.3) (emphasis added).

17

"Acts or omissions" are not defined by the Subcontract. In such a situation, "'it is common practice for the courts of [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract.'" Fed. Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 567 (2d Cir. 2011) (alteration in original) (quoting 10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co., 634 F.3d 112, 119 (2d Cir. 2011)).

Dictionaries generally define "omission" as "[a] failure to do something; esp[ecially] a neglect of duty." Black's Law Dictionary (10th ed. 2014); see also The Anderson Law Dictionary (2002) (defining omissions as "the neglect to perform what the law requires" or "[a] failure to act"); Ballentine's Law Dictionary (2010) (defining "omission" as "[a] leaving out. A failure to act. The failure to do something which ought to be done; not doing something required").

According the word "omission" its ordinary meaning, the Court finds that the alleged failure by DPR to timely approve the Augur Piles, which are "foundational elements" that the SAC alleges were necessary for Superior to complete its work on the Project, could constitute an "omission" within the meaning of Section 6.3 and therefore, provide a basis for Superior to submit a Change Order Request for NASDI to increase the Subcontract price. Further, as discussed earlier, although somewhat vague and general, the SAC does sufficiently allege that it submitted a Change Order Request to NASDI in compliance with the conditions set forth in Section 6.3 and that NASDI approved the request. Therefore, construing the allegations in the SAC as true, the Court finds it reasonable to conclude that NASDI breached the Subcontract by failing to pay Superior $1,534,952.51 for the additional expenses that Superior incurred as a result of DPR's delay in approving Superior's use of Augur Piles.

However, NASDI correctly notes that other provisions of the Subcontract suggest that NASDI is not responsible for the acts of DPR. Specifically, Section 10.2 imposed an obligation on NASDI to "take all reasonable to secure from [DPR], such contractual benefits that <u>may</u> be claimable on behalf of [Superior]." (Subcontract at § 10.2) (emphasis in original). However, Section 10.5 of the Subcontract states:

> NASDI shall represent [Superior] in its claims only to the extent of passing the claim on to [DPR] and shall not be required to actively support such claims and [Superior] shall retain responsibility for the proofs and processing of the claims . . . . <u>NASDI is liable to [Superior] with respect to claims only to the extent that [DPR] is determined, by litigation or settlement, to be liable to NASDI</u>.

(Subcontract at § 10.5) (emphasis added).

There is no allegation that Superior requested that NASDI initiate claims against DPR arising from DPR's delayed acceptance of the Augur Piles. Nor is there any allegation that NASDI ever asserted such a claim against DPR on Superior's behalf. Accordingly, it is also reasonable to conclude, as NASDI urges the Court to do, that under these circumstances, Section 10.5 prohibits Superior from holding NASDI liable for DPR's alleged negligence.

However, at this early stage of the litigation, without additional evidence, it is not possible to discern whether Section 6.3 or Section 10.5 applies to Superior's breach of contract claim. Further, as both parties' interpretations appear to be reasonable, the Court finds that, as a matter of law, the Subcontract is ambiguous on the question of whether NASDI breached the Subcontract by refusing to increase the Subcontract price as a result of the delays allegedly occasioned by DPR's negligence. See <u>Serdarevic v. Centex Homes, LLC</u>, 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010) ("On a motion to dismiss, the Court may resolve issues of contract interpretation when the contract is properly before the Court, but must resolve all ambiguities in the contract in Plaintiffs' favor."); <u>Gulf Oil Ltd. P'ship v. Kanji & Kanji Enterprises, Inc.</u>, No.

09-CV-4397 DRH AKT, 2010 WL 4809654, at *5 (E.D.N.Y. Nov. 19, 2010) (denying a motion to dismiss a breach of contract claim "[s]ince reasonable minds could disagree as to the meaning of the Reseller Agreement, [and] the Court finds that the contract is ambiguous as a matter of law") (alteration added); Bank of Am. Corp. v. Lemgruber, 385 F. Supp. 2d 200, 226 (S.D.N.Y. 2005) ("'[W]hen the language of a contract is ambiguous, its construction presents a question of fact,' which of course precludes summary dismissal.") (quoting Jackson Heights Medical Group, P.C., v. Complex Corp., 222 A.D.2d 409, 411, 634 N.Y.S.2d 721, 722 (2d Dep't 1995)).

Accordingly, the Court also denies NASDI's motion to dismiss Superior's breach of contract claim arising from DPR's alleged delays in accepting the Augur Piles.

## II. CONCLUSION

For the foregoing reasons, the Court denies NASDI's partial motion to dismiss in its entirety.

**SO ORDERED.**
Dated: Central Islip, New York
February 9, 2016

                                                _/s/ Arthur D. Spatt____
                                                 ARTHUR D. SPATT
                                              United States District Judge