**FILED**
**CLERK**

3:23 pm, Aug 03, 2018

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

SUPERIOR SITE WORK, INC., DIVERSIFIED
CONSTRUCTION CORP., HARRISON
AVENUE PROPERTIES LLC,

                    Plaintiffs,

      -against-

NASDI, LLC,

                    Defendant.
----------------------------------------------------------------x
NASDI, LLC,

                 Third Party Plaintiff,

      -against-

CASE FOUNDATION COMPANY, and THE
CITY OF NEW YORK,

               Third Party Defendants.
----------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**
2:14-cv-01061  (ADS)(SIL)

**APPEARANCES:**

**Zabell & Associates, P.C.**
*Attorneys for the Plaintiffs*
1 Corporate Drive
Suite 103
Bohemia, NY 11716
        By:    Saul D. Zabell, Esq., Of Counsel

**The Law Office of John E. Osborn, P.C.**
*Attorneys for the Defendant and Third Party Plaintiff*
93–02 Sutphin Boulevard
Jamaica, NY 11435
        By:    Daniel H. Crow, Esq., Of Counsel

**Peckar & Abramson**
*Attorneys for the Third Party Defendant Case Foundation Company*
41 Madison Avenue
20th Floor
New York, NY 10010
  By: Alan H. Winkler, Esq., Of Counsel

**New York City Law Department, Office of Corporation Counsel**
*Corporation Counsel for Third Party Defendant the City of New York*
100 Church Street
Room 3-124
New York, NY 10007
  By: Amanda M. Papandrea, Assistant Corporation Counsel

**SPATT, District Judge:**

This action arises out of a contract dispute between the parties. The contract concerned work related to the Ocean Breeze Indoor Athletic Facility in Staten Island, New York ("Ocean Breeze" or the "Project"). The City of New York (the "City") and the New York City Department of Parks and Recreation (the "Parks Department") contracted with NASDI, LLC ("NASDI") to build Ocean Breeze. NASDI allegedly subcontracted with Superior Site Work, Inc. ("Superior"), Diversified Construction Corp. ("Diversified"), and Case Foundation Company ("Case"). NASDI allegedly leased office space from Harrison Avenue Properties LLC ("Harrison") (together with Superior and Diversified, the "Plaintiffs") during the Project.

Presently before the Court is a motion by NASDI for summary judgment pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 56 dismissing the Plaintiffs' claims against it. For the following reasons, NASDI's motion is granted in part, and denied in part.

## I. BACKGROUND

### A. The Relevant Facts

The following facts are drawn from the parties' respective 56.1 Statements and the parties' evidence.

Initially, the Court notes that both sides often cited to the unverified complaint as "evidence" in their 56.1 Statements. Complaints that are not verified are not evidence. *Marquez v. City of New York*, No. 14-CV-8185 (AJN), 2016 WL 4767577, at *1 n.1 (S.D.N.Y. Sept. 12, 2016) ("On a motion for summary judgment, however, 'allegations in an unverified complaint cannot be considered as evidence.'" (quoting *Continental Ins. Co. v. Atlantic Cas. Ins. Co.,* No. 07-cv-3635, 2009 WL 1564144, at *1 n.1 (S.D.N.Y. Jun. 4, 2009))); *Tomasino v. Estee Lauder Cos., Inc.*, 13-CV-4692, 2015 WL 1470177, at *6 (E.D.N.Y. Mar. 31, 2015) ("The complaint is not admissible into evidence. Once the standard prescribed by *Twombly* and *Iqbal* has been satisfied, the function of the complaint is merely to provide notice."); *Versace v. Versace*, No. 01CIV.9645(PKL)(THK), 2003 WL 22023946, at *1 n.2 (S.D.N.Y. Aug. 27, 2003) ("While a verified complaint may be treated as an affidavit for summary judgment purposes if it meets the requirements of Rule 56(e), an unverified complaint is not useful to the Court on such a motion." (citing, *inter alia, Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir. 2000); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995) (further internal citations omitted))). In addition, despite the Court's request that the parties cite to the evidence as it is labeled in their submissions, they instead often cited to the documents as they were labeled in discovery or during depositions. In short, the Court often had to search the record to discern the evidence to which the parties were referring. That being said, the Court turns to the evidence.

On October 8, 2009, NASDI submitted a bid to the City to complete the foundation, site utilities, and miscellaneous site work for the Project. On March 5, 2010, NASDI and the City executed the Prime Contract for NASDI's work on Ocean Breeze. Pursuant to the Prime Contract, the City had to pay NASDI based on unit prices for materials supplied and installed on

the Project. NASDI's bid estimate for the total price was $17,629,421.37, and was the sum of the estimates for the various line items.

### 1. The Harrison Lease

On October 26, 2009, NASDI and Harrison entered into a lease agreement (the "Lease") in which Harrison agreed to lease a commercial space at 1600 Harrison Avenue, Bay Shore, New York to NASDI. Troy Caruso ("Caruso"), the President of Harrison, Superior, and Diversified, signed the Lease on Harrison's behalf.

Paragraph 3 of the Lease originally stated that "[t]he term of the Lease shall be Monthly commencing November 1, 2009." (Def.'s Ex. D at 001205). However, the word "Monthly" was crossed out. Above the crossed out word, the term "5 yrs" was written, and Caruso apparently initialed the change and dated it February 1, 2010. No one representing NASDI initialed the change. (Battistoni Aff. ¶ 11). The rent was three thousand dollars a month.

As to the change in the lease terms, Caruso testified:

Q: What was the purpose [of making the change to a five year lease term]?
A. Because I think the lease was originally by the month . . . when NASDI was first renting, and then when we landed this job, then it became more of a permanent thing. . . . [It was five years] [b]ecause we were doing some projects together. I don't know. That's what they wanted. . . .
Q: So then Mike Wewiora is the one whose idea it was to make this a five-year term?
A: No. It was my idea, and Mike's, yeah. They didn't want to move all their stuff there and get thrown out in a month's notice. Yeah, it was a mutually agreed thing.
Q: If there's someone from NASDI who agreed to the five year term, it would be Mike Wewiora?
A: Yes.
 . . .
Q: And did anyone from NASDI sign off on the change from monthly to five years?
A: It looks like George Lemelman [then President of NASDI] signed his name on the – printed his name on the bottom, but I can't tell. This is years ago.
 . . .
Q: Did you send a copy of the amended lease to NASDI to execute?

A: I'm sure we must have, yeah.
Q: Did NASDI ever send back a copy of the lease to Superior showing they had signed off on the change from monthly to five years?
A: I'm assuming that this bottom signature is that.
Q: But did anyone from NASDI initial the change on page one?
A: I don't see an initial. . . . I don't see anything on page one.

(Def.'s Ex. C at 289–92).

Pursuant to the terms of the Lease, NASDI paid $2,000 to Harrison each month until February 2012, when NASDI notified Harrison that it was terminating the Lease by letter. (See Def.'s Ex. E). NASDI quit the leased premises at the end of February 2012.

## 2. The Sub-Buyout Agreement

NASDI entered into subcontracts with various subcontractors to complete certain aspects of NASDI's work on the Project. Caruso testified that Superior helped NASDI obtain subcontractor bids.

Between February and April of 2010, NASDI executives discussed with Caruso the possibility of having Superior secure subcontractors to complete work that NASDI had agreed to do, and splitting any savings realized by NASDI from the hiring of the subcontractors. NASDI's savings would have been the difference between the line item in NASDI's bid and the subcontractor's price for that same work.

The Plaintiffs claim that the Sub-Buyout Agreement was confirmed in writing through: an email from Tim Higgins ("Higgins"), who was the President of NASDI at the time, to Caruso on February 17, 2010 memorializing a discussion they purportedly had the week earlier regarding the sub-buyout agreement; an email from Higgins to Caruso on March 2, 2010 again discussing the agreement; an unsigned Memorandum of Understanding dated March 21, 2010 which was written on Superior letterhead detailing the purported agreement; an October 27, 2011 letter from Caruso to NASDI stating that there had been a change in the original agreement

between NASDI and Superior in the form of the profit sharing realized from subcontractor buyouts; a March 8, 2012 email from Caruso to Martin Battistoni of NASDI stating that the contract needed to be changed to reflect, *inter alia*, the 50% profit sharing of subcontractor buyouts; and a two-page spreadsheet apparently compiled by Robert D'Arpa, Superior's Project Manager, which details NASDI's savings that resulted from subcontractor buyouts.

In the February 17, 2010, email from Higgins to Caruso, Higgins said that "[t]his email is to memorialize the agreements we made last week during our dinner discussions." (Def.'s Ex. F at 001197). Higgins then proceeded to outline five points central to the agreement. Relevant here, Higgins said that:

> The project was bid based upon performing $12,000,000.00 of the project with in house crews. NASDI is guaranteed a profit margin of 7.5% on this dollar amount and if the profit margin is higher than anticipated, NASDI and Diversified will split the monies evenly. The remaining $5,000,000.00+ is work that is to be subcontracted and at the time of the bid there was a markup of 3% on this subcontracted work. NASDI and Diversified will split the markup and split any additional cost savings recognized during the buyout of the subcontractors. . . . If a subcontractor is found to perform work originally anticipated to be performed in house, the cost savings will be split evenly between NASDI and Diversified.

(*Id.*).

The memorandum of understanding was prepared by Paul Huffer ("Huffer"), who worked for both Superior and NASDI from May 2010 through November 2010. He worked for NASDI from November 2010 through November of 2011, and for Superior for two and a half years before that. Huffer testified that he prepared the memorandum of understanding "on behalf of Superior to NASDI to try and get this agreement finally written and in place. This was after some back and forth negotiations between them." (Def.'s Ex. H at 20). Relevant here, while the emails from Caruso said that the agreement was between NASDI and Diversified, the memorandum of understanding said that the agreement was between NASDI and Superior.

Caruso testified that a formal contract exists signed by both parties that fully memorialized the Sub-Buyout Agreement, but that only NASDI possesses the contract, and has refused to give it to him. (Def.'s Ex. C at 54–56).

### 3. NASDI's Subcontract with Superior

On or about December 16, 2010, Superior entered into a subcontract with NASDI, in which Superior agreed to install structural concrete for the Project's foundation (the "Superior Subcontract"). Caruso signed the Superior Subcontract on Superior's behalf, and George Lemelman ("Lemelman"), who was president of NASDI at the time, signed on its behalf. Caruso and Lemelman initialed each page of the subcontract except for the signature page, which was only initialed by Caruso.

The Superior Subcontract provided, in relevant part:

1.1 The Subcontractor agrees to furnish all labor, equipment, materials, supplies, tools and supervision to diligently and expeditiously perform all the work as described in the Schedule (hereinafter referred to as the "Work") required for Installation of Structural Concrete for Foundation (hereinafter referred to as the "Project") located in Staten Island, NY for New York City Department of Parks and Recreation, (hereinafter referred to as· the "Owner"), in accordance with all of the plans, drawings, specifications, general conditions, special conditions, and pre-contract addenda of the Prime contract and this Subcontract.
 . . .
1.5 Subcontractor, by signing this Agreement, acknowledges that it has full knowledge of the provisions of the Prime Contract, and confirms and agrees that the entire aforesaid Prime Contract including but not limited to all of the plans, drawings, specifications, general conditions, special conditions and pre-contract addenda, which are part of the Prime contract between the Owner and NASDI, shall be considered and are hereby made a part of this Subcontract by this reference thereto, and the Subcontractor represents that he is familiar with all the terms, conditions, covenants, and provisions thereof. Subcontractor agrees to be bound to NASDI by all of the terms of the Prime Contract and to assume toward NASDI all of the obligations and the responsibilities that NASDI by those instruments assumes toward Owner. Subcontractor further agrees that NASDI shall have the same rights and remedies against Subcontractor that Owner has against NASDI under the Prime Contract as though the terms of those instruments were set forth in full in this Subcontract.
 . . .

3.1 The Subcontractor shall schedule his operations and proceed with the Work, and shall complete the Work or portions. thereof, on or before such final completion and any interim or milestone completion dates for any phase, portion or sequence of the Work as set by either NASDI or the Owner. The Subcontractor agrees to coordinate his Work with any other work to be done on the project by NASDI, the Owner, and any contractors or subcontractors whose work may overlap or conflict with the scope of the Work under this Subcontract.

. . .

5.9 Final Payment shall be the unpaid balance of the Subcontract Amount, and shall become due when the Work described in this Subcontract is fully completed and performed in accordance with this Subcontract and the Prime Contract, and is satisfactory to and approved by Owner, Architect and NASDI. Payment of retention, reserved amounts and final payments shall be made to the Subcontractor only upon NASDI's receipt of the corresponding payment from the Owner.

5.10 In addition to any other requirements at this Subcontract and the Prime Contract, Final Payment shall not become due unless and until the following conditions precedent to Final Payment have been satisfied (a) approval and acceptance of Subcontractors Work by Owner, Architect/Engineer and NASDI, (b) delivery to NASDI of all manuals, "as-built" drawings, guarantees, and warranties for material and equipment furnished by Subcontractor, and any other documents required by the Prime Contract, c) receipt of Final Payment for Subcontractors Work by NASDI from Owner, (d) furnishing to NASDI of satisfactory evidence by Subcontractor that all labor, applicable taxes, fees and fringe benefits, and material accounts incurred by Subcontractor in connection with the Work have been paid in full, (e) furnishing to NASDI a completed Affidavit Release of Lien and Waiver of Claim by Subcontractor and any Sub-subcontractors in a form satisfactory to NASDI (f) an agreement holding NASDI and the Owner free and harmless from any and all claims arising out of or in connection with this Subcontract and in compliance with any other requirement of the Prime Contract.

. . .

6.2 No alterations, increases or decreases shall be made in the Work as shown or described by the Prime Contract except on the prior written order of NASDI, and when so made, the value of the Work or materials added or omitted shall be computed and determined by Subcontractor, subject to the written approval and acceptance by NASDI, and the amount so determined shall be added to or deducted from the Subcontract Amount. Subcontractor shall have no claim for additional work or changed work unless such work has been done in pursuance of a written order from NASDI. Any extra work performed without such written order will be at Subcontractor's cost and expense.

6.3 For changes in the Prime Contract that have been initiated by Owner, for acts or omissions of the Owner and for defects in the Prime Contract, Subcontractor shall submit any claims it may have, including notice thereof, for adjustment in the price, schedule or other provisions of the Subcontract to NASDI in writing in sufficient time and form to allow NASDI to process such claims within the time

and in the manner provided for and in accordance with the applicable provisions of the Prime Contract. Subcontractor agrees that it will accept such adjustment, if any received by NASDI from Owner as full satisfaction and discharge of such claim. Payment for this extra work shall not be made to the Subcontractor until issuance of a written change order and payment to NASDI by the Owner.

6.4  For changes directed by NASDI, which NASDI agrees that the extra work is compensated Subcontractor shall be entitled to an adjustment in the Subcontract price, provided Subcontractor gives NASDI written notice within five (5) days and shall submit the actual Change Order Request within ten (10) days after receipt of the proposed instruction, and prior to performing such changed Work. Failure to provide such notice shall be deemed to prejudice NASDI's rights and to constitute a waiver of such claims by Subcontractor.

 . . .

6.6  If Subcontractor believes the occurrence of some act or event, other than changes ordered by NASDI, justifies a change in the Subcontract Amount or the time for performance of the Work, Subcontractor shall notify NASDI in writing within three (3) days of the occurrence of such act or event and the scope of the change to allow NASDI to forward the notice to Owner. Failure to provide such notice shall be deemed to prejudice NASDI's rights and to constitute a waiver of such claims by Subcontractor.

6.7    The Change Order Request shall consist of the detailed cost estimate outlining the changes in the work and detailed documentation justifying proposed changes in time. This estimate shall be computed in accordance with accepted estimating procedures and in accordance with the terms of the Prime Contract, and the costs for labor and materials shall be at prevailing rates in the Project area. Subcontractor shall be allowed the percentage markup for Subcontractors overhead and profit specified in the schedule unless a lesser percentage is allowed to NASDI's subcontractors in the Agreement between Owner and NASDI.

 . . .

10.2    Subject to Subcontractor's giving notice and other information, NASDI shall take all reasonable steps to secure from the Owner, such contractual benefits that may be claimable on behalf of the Subcontractor. The Subcontractor shall in sufficient time afford NASDI all information and assistance that may be required to enable NASDI to claim such Contractual benefits.  On receiving such Contractual benefits from the Owner, NASDI shall pass on to the Subcontractor such proportion thereof, it being understood that in the case of any claim of the Subcontractor for any additional payment, NASDI's receipt of payment from the Owner shall be a condition precedent to NASDI's liability to the Subcontractor in respect of such claim.

10.5 NASDI shall represent the Subcontractor in its claims only to the extent of passing the claim on to the Owner and shall not be required to actively support such claims and the Subcontractor shall retain responsibility for the proofs and processing of the claims.  The Subcontractor shall reimburse NASDI all costs incurred including attorneys' fees, in passing such claim on to Owner; the Subcontractor shall not advance any frivolous or unsupported claims. NASDI is

liable to Subcontractor with respect to claims only to the extent that the Owner is determined, by litigation or settlement, to be liable to NASDI.

. . .

12.2 Any decision or determination by Owner or Architect relating to NASDI's performance or compensation under the Agreement between NASDI and Owner that is binding upon NASDI shall also be binding upon Subcontractor insofar as it relates to or involves Subcontractor's performance under, or the terms of this Subcontract. Any decision or determination resulting from arbitration or litigation between NASDI and Owner which relates to Subcontractors performance under, or the terms of, this Subcontract shall be binding upon Subcontractor, provided that Subcontractor has been given reasonable notice of and the opportunity to participate and present evidence in the arbitration or litigation. Insofar as a decision of Owner or Architect relating to Subcontractor's performance of the Work under the terms of this Subcontract is a condition precedent to NASDI's right to proceed to arbitration or litigation under the Prime Contract, such decision is also a condition precedent to Subcontractor's right to proceed to arbitration under this Subcontract.

. . .

23.1 It is understood and agreed that the Work provided for in this Subcontract constitutes only a part of the work being performed for Owner by NASDI and other Subcontractors. Subcontractor, therefore, agrees to perform the Work in such a manner that it will not injure, damage or delay any other Work performed by NASDI or any other subcontractor or supplier, and further agrees to pay or reimburse NASDI for any additional costs, damage or delay that may be caused to such other work of NASDI subcontractors or its agents or employees.

24.6 This instrument and the documents specially incorporated herein by reference represent the entire agreement between NASDI and the Subcontractor and may not be amended without their written consent. All negotiations and agreements prior to the date of this Subcontract not included herein are hereby voided. In the event NASDI and Subcontractor enter into another subcontract on another project, wherever located, a default under said subcontract shall be a default hereunder and vice versa.

(Def.'s Ex. I).

In a "schedule" addendum, the Superior Subcontract also states "Subcontractor's percentage markup for overheads and profit (Clause 6.7) In accordance with Prime Contract General Conditions Section C Article Extra Work Performed as Outlined in Chapter VI Article 25, 26, 27 and 28 Of the Agreement." (*Id.* at 13913).

There are additional handwritten clauses that append paragraphs 3.3 and 23.1 of the Superior Subcontract.

Under 3.3, it states that "Superior Sitework is to be compensated for any acceleration in schedule due to any delays by others. Superior is to be compensated weekly as per contract documents. This can be done on a T+M basis or lump sum change order." The handwritten change is only initialed by Caruso. Battistioni stated that "NASDI never assented in writing to his unilateral, hand-written change." (Battistioni Aff. ¶ 49).

The handwritten clause after 23.1 states, "[a]s per our original agreement, a second contract will follow which splits the subcontractor buyouts 50/50, NASDI + Superior Site. This is approx. $1,500,000 at this point." (*Id.*). Caruso wrote his initials next to this addendum. No one from NASDI appears to have initialed this statement. NASDI claims that this statement was crossed out. While the Plaintiffs did not dispute this point in their 56.1 Statement, it appears just as likely that Caruso attempted to write this statement on three lines, but was unable to keep his handwriting on the line. Thus, the beginning of each line appears above the handmade line, while the second half of each line appears crossed out. It appears as follows:

> As per our original agreement, a second contract
> will follow which splits the subcontractor ~~buyouts 50/50, NASDI + Superior Site~~.
> This is approx.. ~~$1,500,000 at this point.   TC~~

(*Id.*). Battistioni stated that it was crossed out. (Battistioni Aff. ¶ 21).

### 4. NASDI's Change Orders

During the course of the Project, NASDI submitted eight written change orders to Superior: change order no. 1 for ($1,042,650.77) dated April 4, 2012; change order no. 2 for $724,929.75 dated April 4, 2012; change order no. 3 for $1,247,111.91 dated April 4, 2012; change order no. 4 for $95,271.83 dated April 14, 2012; change order no. 5Rev for ($520,888.36) dated July 6, 2012; change order no. 6 for $82,104.48 dated October 5, 2012;

change order no. 7 for $167,578.23 dated October 5, 2012; and change order no. 9 for

$18,500.00 dated March 26, 2013.

### 5. Superior's Releases

Superior signed two releases—one on May 2, 2012 (the May 2012 Release"), and another

on October 16, 2012 ("the October 2012 Release"). The October 2012 Release provides, in

relevant part:

I. Certifications, Affirmations and Warranties
The undersigned, to support its entitlement to the requested payment, and for and
in consideration of payment made by NASDI, LLC ("Contractor") to the
undersigned or to a subcontractor, materialman, or supplier of the undersigned,
and contingent upon the receipt of such payment, for work performed in the
construction of the above-referenced Project pursuant to the above-referenced
Subcontract or Purchase Order, hereby affirms, certifies and warrants as follows:
1. Upon receipt of the sum of $_755,567.95_, as payment for Change Orders 5, 6,
and 7 on the above-referenced Subcontract, the undersigned will have received
final payment, minus retainage, under the terms of the Subcontract or Purchase
Order (and all authorized changes from [change orders] 1-7 thereto) between
Contractor and Subcontractor Superior Site Work ("Subcontractor") relating to
the Project, including (1) all labor expended in the construction of the Project, (2)
all fixtures and equipment delivered to the site and either incorporated or to be
incorporated into the Project, (3) all materials, fixtures and equipment for the
Project stored offsite to the extent authorized by Contractor and for which
payment therefor is permitted by Contractor's contract with the Owner and all
requirements of said contract with respect to materials stored offsite have been
fulfilled, (4) all services performed in the construction of the Project, and (5) all
equipment used, or provided for use, in the construction of the Project. Such work
including items (1) through (5) is hereafter collectively referred to as "work
performed in the construction of the Project."
2.   Except for receipt of payment as set forth in paragraph 1, there are no
outstanding claims against Contractor and/or its sureties, the Owner of the Project
and/or its lenders and guarantors, or the Project in connection with the work
performed in the construction of the Project.
 . . .
II.  Waiver and Release
In accord with the Subcontract Agreement or the Purchase Order, as applicable,
the undersigned does hereby forever waive and release in favor of Contractor and
its sureties, the Owner of the Project and its lenders and guarantors, the Project
and the title company or companies examining and/or insuring title to the Project,
and any and all successors and assignees of the above, all rights that presently
exist or hereafter may accrue to the undersigned by reason of work performed in

the construction of the Project through October 11, 2012, (1) to assert a lien upon the land and/or improvements comprising the Project, and (2) to assert or bring any causes of action, claims, suits and demands which the undersigned ever had or now has against Contractor and/or its sureties, the Owner of the Project and/or its lenders and guarantors, or the Project. The only claims hereunder that is reserved by the undersigned is its claim for delay related damages under the Subcontract ("Subcontractor's Delay Claim"), equipment rental to NASDI and owner related extra work claims. The Subcontractor's Delay Claim and Owner related extra work claims is specifically predicated on Subcontractor providing sufficient proof of the cause of the complained-of delay, extra work and the delay's adverse impact on Subcontractor's work, the Subcontractor's damages resulting directly therefrom, and the Subcontractor's contractual entitlement to those damages, and on the Contractor's recovery of said damages from the Owner.

(Def.'s Ex. L).

### 6. Superior's Claim for Specific Charges

On October 5, 2012, representatives of Superior and NASDI executed change order no. 5. Change order number 5 detailed 11 different changes to the Superior Subcontract. Those changes are listed as items 5A–5K in the change order.

Caruso testified that although Superior signed the change order on that date, "after the actual[] [] quantities were received, there needed to be adjustments made in th[e] change order." (Def.'s Ex. C at 152). He further stated that "we did analysis on every one of these change orders after discovery, and went through each item. . . . We went through each one of these change orders, looked at every line item, compared them to the documentation that NASDI provided us, picked out the differences and that's how we based [] the numbers in the lawsuit." (*Id.*).

The Plaintiffs provided documents that they claim show that they disputed some the charges in change order no. 5. (*See* Pl.'s Ex. 2). The Plaintiffs mostly rely on various pages that appear to be part of an excel spreadsheet. NASDI objects that this evidence is inadmissible, as it is not authenticated by someone with personal knowledge, and there is no evidence that the

documents were ever served on NASDI. See FED. R. CIV. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

NASDI is correct on both points. There is no evidence that these documents were provided to NASDI at any point, and the documents are not properly authenticated by anyone who would have knowledge of the documents. While the Plaintiffs' attorney submitted an affidavit stating that the documents are "true and accurate cop[ies] of [Superior]'s rejection of the back charges for line items 5F, 5G, 5I, and 5J," (Decl. of Saul Zabell i[n] Opp. to Def.'s Mot. for Summ. J. (ECF No. 125-1) ("Decl. of Zabell") ¶ 5), the Plaintiffs' attorney does not have personal knowledge of these matters. See FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *see also Wyler v. United States*, 725 F.2d 156, 160 (2d Cir. 1983) ("An affidavit of the opposing party's attorney which . . . is not based on first-hand knowledge is not entitled to any weight." (internal citations omitted)). Therefore, the Court does not consider these documents.

### 7. Superior's Claim for Extra Work, Change Orders, and Profit Sharing

Superior claims that it had to perform extra work at NASDI's request, and was never paid for it. Specifically, Superior states that it is owed $22,050.60 for open time and material change orders; $150,000 for pile cap and grade beam reports; $153,870.09 for open concrete PSI upgrade change orders; and $175,817.26 for grade beam through pile cap.

### i. Open Time and Material Change Orders

On December 31, 2011, Superior Site Work sent NASDI change order numbers twenty-two (22) and twenty-three (23). Change order 22 was for "the additional rebar drawings requested for pile cap & grade beam Drawing . . . dated March 29, 2011 as directed by NASDI," (Pls.' Ex. 3 at 000444), and totaled $7,078.50. Change order 23 was for "the Increased Design of the Canopy Footing," (*id.* at 000451), and totaled $14,972.10. Caruso testified that the claim for change orders 23 and 23 arose "[a]round February 2011, (Def.'s Ex. C at 186), that NASDI told him they would pay it, and that it resulted from a mistake by a prior subcontractor. Specifically, the prior subcontractor apparently put the piles in the wrong place.

### ii. Pile Cap and Grade Beam Reports

On February 10, 2012, Superior sent change order number thirty-four (34) for "Additional Increase to the Pile Caps and Grade Beams due to Re-Design of Big Upon blue Prints dated- 4/1/2009 and Revised Blue Prints-Revision #3-Dated-10/27/11 & 11/22/2011 as directed by NASDI," (Pls.' Ex. 4 at 000240), and totaled $154,681.04. Caruso testified that the claim first arose on October 17, 2011. (Def.'s Ex. C at 193). He said that "[t]here was a redesign on the job and NASDI issued us a set of blueprints, revision number three. . . . It was additional concrete added and additional rebar. . . . [They were needed because] [t]here was some sort of issue with Case Foundations between Case Foundations and NASDI." (*Id.*). Superior received the revised blueprints on October 17, 2011. The original amount of $154,681.04 was negotiated with the City down to $150,000.

### iii. Open Concrete PSI Upgrade Change Orders

On April 30, 2012, Superior sent change orders number sixty-seven (67) through seventy-four (74). Change order 67 was for "Work Completed on the UPGRADE OF CONCRETE

MATERIAL FROM BID SPEC OF 4,000 PSI to 5,500 PSI Item as directed by [the City]" (Pls.' Ex. 5 at 000755), covered the period from October 20, 2011 to February 3, 2012, and totaled $10,382.24. Change order 68 was for similar work as change order 67, covered the period from October 20, 2011 to February 6, 2012, and totaled $10,973.10. Change order 69 covered similar work as change order 68, was for the period between October 20, 2011, to April 6, 2012, and totaled $7,623.22. Change order 70 was for similar work, and covered the same period as change order 69, and totaled $2,076.52. Change order 71 was for similar work, covered a period of March 1, 2012 to March 31, 2012, and totaled $15,436.17. Change order 72 was for similar work, covered the period of March 1, 2012 to June 30, 2012, and totaled $27,785.72. Change order 73 was for the same work, covered April 24, 2012 to June 30, 2012, and totaled $20,346.68. Change order 74 was for the same work, for the period of March 1, 2012 to June 30, 2012, and totaled $2,258.28.

Caruso testified that Michael Wewiora from NASDI directed the increase in PSI. (Def.'s Ex. C at 205; *see also id.* at 204 (NASDI made a request for us to increase the PSI of the concrete."))

### iv. Grade Beam Through Pile Cap

On February 10, 2012, Superior sent change order number forty-one (41) for "Additional Increase to the Grade Beams due to the Grade Beam Running through the Pile Caps to the actual Pile as directed by NASDI," and totaled $175,817.26. The change order does not detail when the work was done, but Caruso testified that the claim arose in February 2011 as a result of the same design change that lead to change order 34. Caruso further testified that NASDI was notified through "shop drawings, meetings of minutes, . . . negotiations with New York City DDC, Department of Parks and Recreations[;] [t]here's constant communications, blueprints back and

forth, emails, job site meetings, minutes, weekly. There's copies of blueprints that are all marked up that Superior provided NASDI to get paid from the city." (Def.'s Ex. C at 200). The Court notes that the Plaintiffs did not provide the documents listed by Caruso.

### v. Rebar Parking Lot and Rebar Slab on Grade

Caruso also testified that Superior and NASDI allegedly entered into an agreement wherein Superior would negotiate certain change orders with the City, and NASDI and Superior would split the profits from the savings accrued from subcontracting that work. Specifically, Caruso said that the City changed the parking lot specifications from asphalt to concrete with rebar. Caruso testified that this agreement was in writing, but no agreement was provided to the Court. He claimed that Superior was owed $74,359.94. Caruso also testified that the City made a change in the design of the top of the foundation which called for additional rebar. Caruso said that he had provided a change order to NASDI related to the additional rebar for the "slab on grade," but the Plaintiffs did not supply any evidence of a change order. According to Caruso, Superior is owed $176,372 for the additional rebar slab on grade. Caruso was unable to say when the claim arose. It is unclear from Caruso's testimony why Superior is owed this money. The Plaintiffs, in their memorandum of law, argue that Superior is owed the money pursuant to the alleged profit sharing agreement, but Caruso did not testify to that effect.

### 8. Superior's Delay Claim

Although Superior mobilized to the Project on January 2011, they were not able to do much at that time because "the owner didn't accept the overcast piles," and NASDI instructed Superior to demobilize. (Def.'s Ex. C at 232). Superior knew on "day one," (*id.* at 223), even before Superior signed the subcontract, (*id.* at 224), that the progress was delayed because a previous subcontractor had incorrectly installed the piles. Superior demobilized on March 14,

2011, and apparently received the order to demobilize from NASDI at some point between January and March 2011. NASDI ordered Superior to remobilize on October 18, 2011. During those ten months, Superior was not able to do "much" work on the Project. (*Id.* at 233). When Superior remobilized, it had to work during the winter months.

Caruso testified that in March of 2011, he knew that Superior would have to expend more money on the Project because of "[r]educed labor production, increased insurances, winter conditions, winter concrete, blankets on concrete, all of the above construction costs in the winter." (*Id.* at 234). However, in March of 2011, he did not know how long the delay would last.

On September 16, 2011, Superior submitted a written notice of its delay claim to NASDI for $1,534,952.51. (Def.'s Ex. O at N014346–66).

On February 18, 2015, NASDI submitted a claim for delay damages on Superior's behalf to the City in the amount of $1,205,415.00. (*Id.* at N013918-4366). NASDI submitted that amount because it said that Superior's claim for $216,552.29 for the costs of pile deviations was accounted for under change order no. 6, and Superior's claim for $99,003.61 for the increase in concrete strength was an increase in the scope of Superior's work rather than delay damages. Change order 6 states that the change was a "redesign [of] pile caps & grade beams due to Case Foundation of tolerance installation." (Def.'s Ex. J).

The delay claim submitted by NASDI on Superior's behalf is still pending.

### 9. Superior's Claim for Final Payment

Caruso testified that Superior performed its obligations pursuant to the Superior Subcontract and has not received final payment. (Def.'s Ex. C at 272). Superior contends that it is owed $458,328.75, but it does not offer any evidence in support of that number.

Martin Battistoni ("Battistoni"), the former president of NASDI, stated in an affidavit that the City has not yet certified the Project as substantially complete. (Battistoni Aff. (ECF No. 122-2) ¶ 55).

## B. The Relevant Procedural History

On February 19, 2014, the Plaintiffs commenced this action by filing a complaint. The original complaint brought causes of action for breach of contract, conversion, fraud in the inducement, and unjust enrichment against NASDI. The original complaint also named Travelers Casualty and Surety Company of America ("Travelers") as a defendant, but the complaint did not assert any claims against Travelers.

On April 30, 2014, NASDI and Travelers made separate motions to dismiss the complaint pursuant to Rule 12(b)(6). In response, on May 20, 2014, the Plaintiffs filed an amended complaint, which asserts an additional claim against Travelers as surety for NASDI. The Court construed NASDI's motion to dismiss as one addressing the amended complaint. (*See* Mem. of Dec. and Order dated March 14, 2015 (ECF No. 37) at 9).

On March 14, 2015, the Court granted in part, and denied in part the motions to dismiss. The Court dismissed Superior and Diversified's breach of contract claims; the Plaintiffs' unjust enrichment claims pled in the alternative to Superior's breach of contract claims; the Plaintiffs' conversion claims; and the sole claim against Travelers. The Court denied the motions with respect to Harrison's breach of contract claim; and Harrison and Diversified's unjust enrichment claims asserted in the alternative to their breach of contract claims. The Court granted Superior and Diversified leave to file a second amended complaint.

On April 13, 2015, the Plaintiffs filed a second amended complaint against NASDI. The second amended complaint includes claims for breach of contract by each of the Plaintiffs; and

claims for unjust enrich in the alternative by Diversified and Harrison. Harrison's breach of contract claim is predicated on the Lease; Diversified's claim is premised upon the Sub-Buyout Agreement; and Superior's claim is based on the Superior Subcontract and change orders.

On April 27, 2015, NASDI filed a motion to dismiss the second amended complaint, which was denied in its entirety by the Court on February 9, 2016.

On March 25, 2016, NASDI filed a thirty-party complaint against the City, Case Foundation Company ("Case"), and the New York City Department of Parks and Recreation (collectively, the "Third-Party Defendants").

The Plaintiffs and Third-Party Defendants subsequently filed various motions to dismiss, sever, or hold in abeyance the third-party complaint.

On January 23, 2017, the Court granted Case's motion to hold the third-party action in abeyance pending the outcome of parallel cases in New York State Supreme Court. In addition, the Court granted the New York City Department of Parks and Recreation's motion to dismiss all claims against it.

On November 10, 2017, NASDI filed the instant motion for summary judgment pursuant to Rule 56 seeking dismissal of the second amended complaint.

## II. DISCUSSION

### A. The Legal Standard

Pursuant to Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When deciding a motion for summary judgment, "[t]he Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non–

moving party.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)).

"[A]t the summary judgment stage the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (internal quotation marks omitted)). In other words, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Barrows v. Seneca Foods Corp.*, 512 F. App'x 115, 117 (2d Cir. 2013) (summary order) (quoting *Redd*, 678 F.3d at 174 (internal quotation marks omitted)). The Court should not attempt to resolve issues of fact, but rather "assess whether there are any factual issues to be tried." *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

The movant has the burden of demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). If a nonmoving party fails to make a sufficient showing on an essential element of their case where they will have the burden of proof, then summary judgment is appropriate. *Id.* at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Liberty Lobby*, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for that party. *See Dawson v. Cty. of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004).

In contract cases, "summary judgment may be granted . . . only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to

convey a definite meaning." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.,* 526 F.3d 63, 68 (2d Cir. 2008). An agreement is ambiguous where "a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Id.* "To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Id.* "[T]he mere assertion by a party that contract language means something other than what it clearly says is not sufficient to raise a triable issue of fact." *239 East 79th Owners Corp. v. Lamb 79 & 2 Corp.,* 30 A.D.3d 167, 168, 818 N.Y.S.2d 194, 195 (1st Dep't 2006).

## B. The Relevant Law

As stated above, the Plaintiffs brought causes of action for breach of contract, and Harrison and Diversified brought unjust enrichment claims in the alternative.

### A. Breach of Contract

In New York, the elements of a breach of contract claim are "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of the defendant to perform; and (iv) damages." *Johnson v. Nextel Comm'ns. Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).

### B. Unjust Enrichment

Under New York law, the elements of unjust enrichment are: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Legurnic v. Ciccone*, No. 09-

CV-1436 ADS AKT, 2014 WL 6674593, at *7 (E.D.N.Y. Nov. 25, 2014) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004)).

Under New York law, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190, 193 (N.Y. 1987); *see also Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) ("New York law does not permit recovery in *quantum meruit*, however, if the parties have a valid, enforceable contract that governs the same subject matter as the *quantum meruit* claim.").

## C. Application to the Plaintiffs' Claims

### 1. As to Harrison's Breach of Contract Claim

Harrison argues that NASDI breached the Lease when it terminated it prior to the expiration of the purported five-year term. NASDI argues that Harrison has not proffered any evidence that NASDI accepted the material change, or that there was consideration given in exchange for the modification. The Court agrees with NASDI on both points.

The evidence is clear that on October 26, 2009, agents of Harrison and NASDI signed the Lease, which was a month-to-month lease. Harrison claims that the Lease was modified on February 1, 2010 to a five-year term.

Under New York law,

An agreement, promise or undertaking to change or modify, . . . in whole or in part, any contract, obligation, or lease, or any mortgage or other security interest in personal or real property, shall not be invalid because of the absence of consideration, provided that the agreement, promise or undertaking changing, modifying, or discharging such contract, obligation, lease, mortgage or security interest, shall be in writing and signed by the party against whom it is sought to enforce the change, modification or discharge, or by his agent.

23

N.Y. GEN. OBLIG. LAW § 5-1103.

Here, while Caruso initialed the change on the first page and initialed it again on the second page under the date "2/1/10" and the term "am[]ended", no one from NASDI initialed or signed the change on the first page of the Lease or the note that the contract was amended on the second page. Caruso testified that no one from NASDI initialed the change on the first page. While Harrison attempts to rely on Caruso's testimony wherein he said that it looked like Lemelman printed his name on the bottom, he said that he could not tell. He further said that he "assum[ed] that the bottom signature" from Lemelman related to the modification. However, conjecture and assumptions are insufficient to create a triable issue of fact. *Cifarelli v. Vill. of Babylon,* 93 F.3d 47, 51 (2d Cir. 1996) (stating that "mere conclusory allegations, speculation or conjecture" will not suffice to defeat summary judgment); *see also D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some *hard evidence* showing that its version of the events is not wholly fanciful." (emphasis added)).

Harrison has not offered any evidence that NASDI signed a modification after October 26, 2009. NASDI's sole signature on the Lease is from October 26, 2009, and there is no indication that they agreed to the modification.

To the extent that Harrison relies on an oral modification, it has failed to show that consideration was given to NASDI for the modification. "To be enforceable, an oral modification must possess all of the elements necessary to form a contract, including valid consideration." *Cohan v. Movtady,* 751 F. Supp. 2d 436, 442, 2010 WL 4608751, at *5 (E.D.N.Y. Nov. 1, 2010) (citing cases). An agreement to do something which the promisor is already required to do by an existing contract is unsupported by consideration. *See Indus.*

*Window Corp. v. Fed. Ins. Co.*, 609 F. Supp. 2d 329, 340 (S.D.N.Y. 2009) ("[E]ven assuming . . . that the alleged oral modifications were otherwise valid, there is no indication that such modifications . . . were supported by adequate consideration." (internal citations omitted)). As Harrison did not provide NASDI any additional consideration for the modification, any oral modification would not have been enforceable.

Therefore, Harrison has not provided any evidence that NASDI agreed to the modification of the Lease to a five-year term. Accordingly, NASDI's motion for summary judgment on Harrison's breach of contract claim is granted.

### 2. As to Harrison's Unjust Enrichment Claim

NASDI contends that Harrison's unjust enrichment claim must be dismissed because the written Lease governs Harrison's claims. Harrison did not respond, in any way, to this argument. Therefore, Harrison's unjust enrichment claim is deemed abandoned. *See Robinson v. Fischer*, No. 09 CIV. 8882 LAKAJP, 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) ("Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismissing such a claim." (citing *Lipton v. Cty. of Orange,* 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.")) (citing cases); *see also Bonilla v. Smithfield Assoc. LLC,* 09 Civ. 1549, 2009 WL 4457304 at *4 (S.D.N.Y. Dec. 4, 2009) (dismissing certain claims where the plaintiff failed to respond to the defendant's arguments); *Thomas v. Atl. Express Corp.,* 07 Civ.1978, 2009 WL 856993 at *2 (S.D.N.Y. Mar. 31, 2009) (same) (citing *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 722–23 (S.D.N.Y. 2005)); *Burchette v. Abercrombie & Fitch Stores, Inc.,* 08 Civ. 8786,

2009 WL 856682 at *9 (S.D.N.Y. Mar. 30, 2009) (dismissing plaintiff's constructive discharge claim because plaintiff abandoned it by failing to address it in her opposition motion to defendant's motion to dismiss all claims); *Hanig*, 384 F. Supp. 2d at 723 ("[B]ecause plaintiff did not address defendant's motion to dismiss with regard to this claim, it is deemed abandoned and is hereby dismissed."); *Martinez v. Sanders,* 02 Civ. 5624, 2004 WL 1234041 at *3 (S.D.N.Y. June 3, 2004) ("Because Plaintiff did not address Defendant's motion to dismiss with regard to these claims, they are deemed abandoned."); *Anti–Monopoly, Inc. v. Hasbro, Inc.,* 958 F. Supp. 895, 907 n. 11 (S.D.N.Y.) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue . . . which provides an independent basis for dismissal."), *aff'd,* 130 F.3d 1101 (2d Cir. 1997).

Accordingly, NASDI's motion for summary judgment dismissing Harrison's unjust enrichment claim is granted.

### 3. As to Diversified's Breach of Contract Claim

NASDI argues that Diversified's breach of contract claim must be dismissed because it was an oral agreement that is barred by the Statute of Frauds; the writings which Diversified claims constitute the Sub-Buyout Agreement were never signed by NASDI and had uncertain terms; and the merger clause in the Superior Subcontract renders any previous agreement invalid. In opposition, Diversified contends that the parties entered into a written contract; and that the merger clause in the Superior Subcontract does not control NASDI's agreement with Diversified. Notably, Diversified does not contend that the parties had an oral agreement, or that there was a preliminary agreement; instead, it solely argues that the parties entered into a binding written agreement. The Court finds that the documents offered by Diversified show that there was not a meeting of the minds regarding the subcontractor buyouts.

An exchange of emails may constitute a binding contract under New York law. *Rubinstein v. Clark & Green, Inc.*, 395 F. App'x 786, 788 (2d Cir. 2010) (summary order). Additionally, "a written contract may be formed from more than one writing. Relevant writings creating a contract may consist of letters bearing the signature of only one party or even memoranda unsigned by either party." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572–73 (2d Cir. 1993) (internal citations omitted). "[I]f the parties have settled on the contract's substantial terms, a binding contract will have been created . . . ." *Id.* at 574. However, documents do not form a contract where "the parties contemplate further negotiations and the execution of a formal instrument." *Rubinstein*, 395 F. App'x at 788 (quoting *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.,* 145 F.3d 543, 547 (2d Cir. 1998)).

"For a contract to be binding, the parties' agreement must be definite enough so that the parties' intent can be ascertained with some degree of certainty." *Oscar Prods., Inc. v. Zacharius,* 893 F. Supp. 250, 255 n.3 (S.D.N.Y. 1995) (citing *Candid Prods., Inc. v. Int'l Skating Union,* 530 F. Supp. 1330, 1333 (S.D.N.Y. 1982)). The plaintiff has the burden of establishing all essential terms of the alleged contract, with sufficient definiteness that the Court can interpret its terms. *Oscar Prods.,* 893 F. Supp. at 255.

Here, no reasonable juror could find that the email exchange between Higgins and Caruso constituted an agreement because Caruso took issue with several of the terms in Higgins' initial email and clearly desired further negotiation.

Higgins' February 17, 2010 email seemingly set forth the terms of an agreement he had reached with Caruso a week earlier, including that

> NASDI is guaranteed a profit margin of 7.5% on [the $12 million project] and if the profit margin is higher than anticipated, NASDI and Diversified will split the monies evenly. . . . All decisions on subcontracting will be made by NASDI with input from Diversified. . . . Project Management and Site Supervision will be paid

for by NASDI and selection of the personnel will be made with input from both NASDI and Diversified with NASDI having control over the final decision.

(Def.'s Ex. F at 001197).

However, Caruso's reply email, copied and quoted in Higgins' March 2, 2010 email, shows that he did not agree to all of those terms. Caruso said that there was:

no guarantee on 7.5%. [W]e said we are going to split everything at the end of the conversation. I told you there is 15% profit and overhead on the in house work above direct costs. . . . Just spoke to Paul [Huffer] and there is 2% sub on top of subs not 3 which is irrelevant because we will buy down as much as we can. . . . I am under the impression that the entire job will be split and [NASDI] will lay out all monies. . . . The 15% is an estimate. There are no guarantees on an estimate. Hopefully it's more. I would like to beat the 15% if possible. . . . I also feel like I should have as much say as you when it comes to hiring and making decisions re the project as you should on the other project. . . . I have no problem informing you of all decisions. All decisions will be made with reputation and making money in mind but I will not hurt our rep for a few cents here and there. I will create a form that you and I could sign or Paul and Greg on all major decisions just so we[']re on the same page. I'm sure we[']ll have some kinks but we[']ll get them worked out. Looking forward to these jobs.

(Id. at 001198).

Higgins responded to Caruso's email saying that

There is a guarantee just like you, me and Chris spoke about and it is at a MINIMUM 7.5% for NASDI. What was said is a 15% markup on work directly performed by Diversified and/or NASDI (approximately $12 million[]) and that we would split the profits evenly if the work outperforms the estimate. It was clearly stated that NASDI is guaranteed, again, a MINIMUM of 7.5% profit. . . . This job was brought to NASDI by Diversified with the guarantee that NASDI would profit from this project. NASDI is NOT in the business of financing work and NOT making money. If you are not comfortable with the estimate, then say so and we can proceed in another direction. . . . NASDI will listen to any and all input, final decisions will be NASDI's and NASDI's alone. NASDI is the one taking the risk on the front end by financing projects and NASDI therefore will have final say on any and all matters concerning monies, including hiring personnel. . . . Chris or I will be involved in all major decisions and we will value whatever input you or Paul [Huffer] have when it comes to the projects. I don't know that we need a form, but if you want to create one we can look at it. Again, NASDI will have final say on all decisions, major or minor.

(Id.).

28

As Caruso's reply shows, he believed that they had agreed to splitting everything, not just those profits that were above 7.5%; he also wanted to have as much power in making decisions as Higgins. Higgins March 2, 2010 email illustrates that they were still working out the details. Relevant here, Higgins told Caruso that if he did not like the estimate, "then say so and we can proceed in another direction." (*Id.*). As such, neither party intended for the agreement laid out in the February 17, 2010 email to be binding. Caruso wanted to change some terms, and Higgins said they could go in a different direction if Higgins did not like the estimate. While the Plaintiffs are correct that Higgins' initial email did not express an intention to further negotiate, Caruso's email does. *See Rubinstein*, 395 F. App'x at 788 (stating that "an exchange of emails" does not form a contract where "the parties contemplate further negotiations"). Furthermore, there is no evidence that the parties intended to be bound by the terms of Higgins' initial email. Therefore, there was not a meeting of the minds. *See O'Donnell v. King B 100, LLC*, No. 1:14-CV-1345, 2016 WL 7742779, at *14 (N.D.N.Y. May 3, 2016) ("It is Plaintiff's burden . . . to demonstrate the existence of a meeting of the minds, including the parties' mutual assent and mutual intent to be bound." (internal alterations, citations, and quotation marks omitted)).

The emails stand in contrast to the case cited by the Plaintiffs, *Scheinmann v. Dykstra*, No. 16 CIV. 5446 (AJP), 2017 WL 1422972 (S.D.N.Y. Apr. 21, 2017). In *Scheinmann*, an agreement was reached between two parties' attorneys. In the initial email, counsel set forth the terms of the proposed agreement. The opposing attorney answered in an email that "[w]e have a deal. I will put together a consent judgment within the next week." *Id.* at *1. That same attorney said in a subsequent email that there was no need for a comprehensive written agreement because "the entirety of the settlement agreement was defined in their prior emails." *Id.* (internal quotations citations to the record omitted). Here, in contrast, instead of saying that

Higgins' statement of the agreement was correct and that they had an agreement, Caruso wanted changes to the material terms including how much of the profit would be divided.

The conduct of the parties after the emails further illustrates that there was not a meeting of the minds. Although the emails said that NASDI and Diversified would split the profits from the subcontractor buyouts, the memorandum of understanding, the October 27, 2011 letter, the March 8, 2012 email from Caruso, the spreadsheet, and Caruso's proposed amendment to the Superior Subcontract all state that NASDI and Superior would split the profits. If Caruso and Higgins truly had a meeting of the minds through the emails they exchanged, there would not have been a need to change the material terms to include a different party altogether.

These documents also show that Caruso desired to have the agreement placed in writing. The memorandum of understanding contains signature lines for NASDI and Superior and states that "[s]igning below shall constitute acceptance of this agreement as outlined above." (Def.'s Ex. F at 001201). The October 27, 2011 letter requested that the Superior Subcontract be amended to include the subcontractor profit sharing. The March 8, 2012 email from Caruso asked NASDI to "give [him] 50% of buyouts or remove [section 24.13 of the Superior Subcontract]." (*Id.* at 001203). Caruso also attempted to amend the Superior Subcontract to say that "[a]s per out original agreement, *a second contract will follow* which splits the subcontractor buyouts 50/50 NASDI + Superior Site." (Def.'s Ex. I at 013909 (emphasis added)). Caruso signed the Superior Subcontract a year after the emails with Higgins. By Caruso's own words, he believed that the parties intended to place the subcontractor buyout agreement into a formal agreement.

Therefore, the Plaintiffs have failed to present sufficient evidence to create a question of fact as to whether NASDI and Diversified made a written agreement regarding the sharing of the

subcontractor buyouts. No reasonable juror could find that such a binding written agreement existed. Accordingly, NASDI's motion for summary judgment pursuant to Rule 56 dismissing Diversified's breach of contract claim is granted.

### 4. As to Diversified's Unjust Enrichment Claim

NASDI argues that as there was no written agreement, Diversified's unjust enrichment claim is barred by the statute of frauds. (Def.'s Mem. of Law at 6). The Plaintiffs did not respond, in any way, to this argument. Therefore, Diversified's unjust enrichment claim is deemed abandoned. *See* Sec. II-2 *supra*. Accordingly, NASDI's motion for summary judgment pursuant to Rule 56 dismissing Diversified's unjust enrichment claim is granted.

### 5. As to Superior's Breach of Contract Claims

#### i. As to Superior's Claim for Specific Charges

Superior's claims for specific charges all relate to their supposed rejection of NASDI's change order number 5. Superior states that they did not need to notify NASDI in writing of their rejection of the change order.

NASDI and Superior both signed change order number 5 on October 5, 2012. Superior claims that, at some point, they disputed several of the line items in change order number 5, and that they are owed the money from their rejection of those line items.

According to the Second Amended Complaint, Superior's claim is based on 3.3, 5.2, 6.4, 6.6, and 6.7 of the Superior Subcontract, as well as the change orders themselves. (Second Am. Compl. ¶¶ 28–32, 75–77). Those sections state that:

> 3.3  In connection with his Work, the Subcontractor shall submit to NASDI on a daily basis, on a form approved by NASDI, information detailing the number of employees working on the Project, their classification, hours worked, type of work performed, materials utilized, equipment utilized, including information on the status of shop drawings, submittals and materials or equipment which may be

in the course at preparation, manufacture or delivery, and such other information as NASDI may require.

. . .

5.2 On the day specified in the Schedule, the Subcontractor shall submit to NASDI a written requisition for payment complete with sufficient breakdown data to permit checking and approval, and in a form acceptable to NASDI showing the proportionate value of the Work complete to that date and, sufficiently in advance to permit NASDI to forward each Application as required by the Prime Contract. Applications for Progress Payments received by NASDI after such date will only be processed by NASDI the following month.

. . .

6.4 For changes directed by NASDI, which NASDI agrees that the extra work is compensated Subcontractor shall be entitled to an adjustment in the Subcontract price, provided Subcontractor gives NASDI written notice within five (5) days and shall submit the actual Change Order Request within ten (10) days after receipt of the proposed instruction, and prior to performing such changed Work. Failure to provide such notice shall be deemed to prejudice NASDI's rights and to constitute a waiver of such claims by Subcontractor.

. . .

6.6 If Subcontractor believes the occurrence of some act or event, other than changes ordered by NASDI, justifies a change in the Subcontract Amount or the time for performance of the Work, Subcontractor shall notify NASDI in writing within three (3) days of the occurrence of such act or event and the scope of the change to allow NASDI to forward the notice to Owner. Failure to provide such notice shall be deemed to prejudice NASDI's rights and to constitute a waiver of such claims by Subcontractor.

6.7 The Change Order Request shall consist of the detailed cost estimate outlining the changes in the work and detailed documentation justifying proposed changes in time. This estimate shall be computed in accordance with accepted estimating procedures and in accordance with the terms of the Prime Contract, and the costs for labor and materials shall be at prevailing rates in the Project area. Subcontractor shall be allowed the percentage markup for Subcontractors overhead and profit specified in the schedule unless a lesser percentage is allowed to NASDI's subcontractors in the Agreement between Owner and NASDI.

(Def.'s Ex. I). In their memorandum of law, the Plaintiffs state that "line items 5F, 5G, 5I, and 5J were rejected in writing." (Pls.' Mem. of Law at 5). By that logic, they appear to acknowledge that clauses 6.4 and 6.6 apply to their claims for specific charges, and that they had to reject the claims in writing.

Yet, later in their memorandum of law, they appear to argue that clauses 6.4 and 6.6 are inapplicable to their claim for specific charges. (*Id.* at 15). This argument contradicts the

Plaintiffs' claims for specific charges in the second amended complaint, which states that the claims are based on those very clauses.

If Superior did not have to comply with clauses 6.4 and 6.6 when it rejected the line items in change order number 5, and those sections do not control, it is unclear what agreement NASDI breached by failing to pay Superior back for the line items that were rejected. Superior has not introduced any evidence that the parties made some other agreement regarding the rejection of change orders. Nor has Superior proffered any case law that would support its position that it should be compensated without regard for the Superior Subcontract. (*See id.* at 14–16). Therefore, Superior's claim for specific charges must fail if it is not based on the Superior Subcontract.

Similarly, to the extent that the Plaintiffs argue that Superior complied with sections 6.4 and 6.6, and that NASDI breached those sections of the Superior Subcontract by failing to pay them back, that argument fails as well. Sections 6.4 and 6.6 both require that Superior notify NASDI in writing within a certain period of time when it believes that a change to the subcontract amount is necessary, whether that change is because of NASDI or because of some other act or event. The evidence shows that Superior specifically agreed to all of the line items in change order number 5. There is no evidence that Superior *ever* notified NASDI that it believed that changes to the subcontract amount were necessary because it rejected some of the line items in that change order. As the subcontract states, failure to notify NASDI in writing of the changes amounts to a waiver. Instead, the evidence shows that Superior specifically agreed to all of the line items in change order no. 5

"Under New York law, '[e]xpress conditions precedent, which are those agreed to and imposed by the parties themselves, must be literally performed.'" *Travelers Cas. And Sur. Co. v.*

*Dormitory Auth–State of New York,* 735 F. Supp. 2d 42, 75 (S.D.N.Y. 2010) (quoting *Klewin*

*Bldg. Co., Inc. v. Heritage Plumbing & Heating, Inc.,* 42 A.D.3d 559, 840 N.Y.S.2d 144, 145

(2d Dep't 2007)); *see also D.C.R. Trucking & Evacuation, Inc. v. Aetna Cas. and Sur. Co.,* No.

96 Civ. 3395, 2002 WL 32096594, at *6 (E.D.N.Y. Oct. 31, 2002) ("Failure to strictly comply

with contractual notice and documentation provisions has been held to constitute a waiver of any

claim for damages."); *Perini Corp. v. City of N.Y.,* 18 F. Supp. 2d 287, 295 (S.D.N.Y. 1998)

("An 'enshrined principle' of New York law requires strict compliance with notice provisions in

general, as recently reaffirmed by the New York Court of Appeals."); *A.H.A. Gen. Constr. v.*

*N.Y.C. Hous. Auth.,* 92 N.Y.2d 20, 33, 677 N.Y.S.2d 9, 16, 699 N.E.2d 368, 375 (N.Y. 1998)

(explaining that notice and documentation provisions serve an important public interest in that

they "provide public agencies with timely notice of deviations from budgeted expenditures or of

any supposed malfeasance, and allow them to take early steps to avoid extra or unnecessary

expense, make any necessary adjustments, mitigate damages and avoid the waste of public

funds.").

"Strict compliance with a contractual notice provision is particularly appropriate when

the relevant provision expressly states that notice of a claim is a condition precedent to bringing

such a claim, and that the consequence of failure to do so is a waiver of the claim." *Mendelsohn*

*v. Port Auth. Trans-Hudson Corp.*, No. 11-CV-03820 ADS, 2012 WL 3234107, at *7–8

(E.D.N.Y. Aug. 3, 2012) (Spatt, J.) (collecting cases); *see also Northgate Elec. Corp. v. Barr &*

*Barr, Inc.,* 61 A.D.3d 467, 468–69, 877 N.Y.S.2d 36, 37–38 (1st Dep't 2009) (noting that the

"notice clause provide[d] that '[i]n default of such notice the claim is waived'"); *Morelli*

*Masons, Inc. v. Peter Scalamandre & Sons, Inc.,* 294 A.D.2d 113, 742 N.Y.S.2d 6 (1st Dep't

2002) (observing that the notice clause "specifically provided that the failure to comply with such provision would constitute a waiver of the subcontractor's claim for damages").

The Plaintiffs rely on Exhibit 2, which they state is Superior's rejection of back charges for several line items in change order no. 5. However, as stated above, no one with personal knowledge authenticated the exhibit. The affidavit from the Plaintiffs' attorney merely states that it is "a true and correct copy of [Superior]'s rejection of the back charges for line items 5F, 5G, 5I, and 5J . . . ." (Decl. of Zabell ¶ 5). Even if the Court were to consider exhibit 2, it is a collection of receipts and excel spreadsheets that do not show that Superior ever notified NASDI of its rejection of the line items. This exhibit stands in stark contrast to the Plaintiffs' other exhibits, which are change orders addressed to NASDI with specific dates.

In addition, Superior's October 2012 Release stated that:

> [u]pon receipt of the sum of $755,567.95, as payment for Change Orders 5, 6, and 7 . . . [Superior] will have received final payment, minus retainage under the terms of the Subcontract or Purchase Order . . . including (1) all labor . . . , (2) all fixtures and equipment delivered . . . , (3) all materials, fixtures, and equipment for the Project . . . , (4) all services performed in the construction of the Project, and (5) all equipment used, or provided for use, in the construction of the Project. . . . Except for receipt of payment as set forth [above], there are no outstanding claims against [NASDI] . . . in connection with the work performed in the construction of the Project. . . . [Superior] waive[s] and release[]s in favor of [NASDI] . . . all rights that presently exist or hereafter may accrue to [Superior] by reason of work performed in the construction of the Project through October 11, 2012 . . . to assert or bring any causes of action, claims, suits and demands which [Superior] ever had or now has against [NASDI] . . . .

(Def.'s Ex. L). The waiver went on to say that Superior did not waive any claims related to delays, equipment rentals, or owner related extra work.

As Superior explicitly acknowledged that it was accepting a sum certain as payment for change order number 5; acknowledged that it had no outstanding claims; and waived any claims that had accrued through October 11, 2012, any claims related to change order 5 were waived by

the October 2012 Release. "The law of New York states that where the language with respect to the parties' intent is clear and unambiguous, it will be given effect . . . . Here, the plain language of the [release] releases [Superior for any claims related to change order number 5]." *Kay-R Elec. Corp. v. Stone & Webster Const. Co.*, 23 F.3d 55, 58–59 (2d Cir. 1994) (internal citations, quotation marks, and alterations omitted).

Therefore, there is no evidence that Superior ever notified NASDI of its rejection of several of the line items in change order no. 5; NASDI did not breach the Superior Subcontract; and Superior's claim for specific charges fails. Furthermore, Superior signed a release waiving any claims related to change order number 5. Accordingly, NASDI's motion for summary judgment pursuant to Rule 56 dismissing Superior's claim for specific charges is granted.

### ii. As to Superior's Claims for Outstanding Extra Work, Change Orders, and Profit Sharing

The claims for open time and material change orders; pile cap and grade beam reports; open concrete PSI upgrade change orders; and grade beam through pile cap all arise out of Superior's change orders numbered 22, 23, 34, 41, and 67–74. Change orders 22 and 23 were sent to NASDI on December 31, 2011 for claims that arose about February 2011. (*See* Def.'s Ex. C at 186). Change order numbers 34 and 41 were sent to NASDI on February 10, 2012 for claims that arose on October 17, 2011 when Superior received revised blueprints. Change order numbers 67 through 74 were sent on April 30, 2012 for claims that also arose out of the October 17, 2011 revised blueprints. According to the change orders, the work on change orders 22, 23, 34, and 41 were all for work that was directed by NASDI. The work in change orders 67 through 74 was directed by the City.

As stated above, the Superior Subcontract requires that Superior submit a notice of a change in the subcontract price within five days of receiving NASDI's proposed instruction, and

was to send a change order request within ten days of receiving the instruction. (Def.'s Ex. I ¶ 6.4). Changes caused by any other event were to be submitted within three days of the event. (*Id.* ¶ 6.6).

However, the Court's analysis does not terminate with the language of the contract. Although neither side raises the issue, the law in New York states that "when a party knowingly receives and accepts the benefits of extra work outside the scope of a construction contract orally directed by himself and his agents, such conduct constitutes a waiver of the requirement [that the extra work be performed pursuant to a writing]." *S. Leo Harmony, Inc. v. Binks Manufacturing Co.,* 597 F. Supp. 1014, 1032 (S.D.N.Y. 1984), *aff'd,* 762 F.2d 990 (2d Cir. 1985); *see also U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.,* 95 F.3d 153, 165 (2d Cir. 1996) ("New York law permits an extra work damages claim for extra work, orally directed, outside the scope of the contract, notwithstanding the provision that a claim for extra work must be supported by written authorization." (internal citations omitted)); *Gen. Ins. Co. of Am. v. K. Capolino Constr. Corp.,* 983 F. Supp. 403, 429 (S.D.N.Y. 1997); *Com–Tee, Inc. v. Bilt Rite Steel Buck Corp.,* No. 94 Civ. 4215(LMM), 1996 WL 328745, at *3 (S.D.N.Y. June 13, 1996). Therefore, under New York law, Superior would not be foreclosed from seeking payment for its extra work that was directed by NASDI despite failing to comply with the requirements of the Superior Subcontract.

While Superior would normally be able to recover for all of the extra work it performed at NASDI's direction, Superior signed two releases on May 2, 2012 and October 16, 2012. The May 2012 Release released NASDI from any claims related to the Project through April 7, 2012. The October 2012 Release released NASDI from any and all claims related to the Project through October 11, 2012, except for those claims related to delays, equipment rentals and owner

related extra work claims. NASDI argues that these releases apply to Superior's claims for open time and material change orders, and pile cap and grade beam reports.

Superior did not respond to these arguments, and therefore the Court deems Superior's lack of response as consenting to NASDI's arguments regarding waiver. *See Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at *1 n.1 (N.D.N.Y. Oct. 30, 2009) (collecting cases that stand for the proposition that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are deemed to have consented to defendants' argument); *Di Giovanna v. Beth Isr. Med. Ctr.,* 08–CV–2750, 2009 WL 2870880, at *10 n.108 (S.D.N.Y. Sept. 8, 2009) (citing cases for proposition that plaintiff's failure to respond to argument made in summary judgment motion as to why certain claim should be dismissed constitutes abandonment of claim); *Niles v. Nelson,* 72 F. Supp. 2d 13, 22 (N.D.N.Y. 1999) (holding that when a party does not respond to a portion of the opposing party's motion, they indicate that they consent to the granting of summary judgment with respect to that portion of the motion or have abandoned the claim).

As the work in change orders 22, 23, 34, and 41 were directed by NASDI; accrued before October 6, 2012; and Superior explicitly waived any claims against NASDI related to the Project through October 11, 2012 except for those claims enumerated above, Superior is barred from bringing claims for those change orders. Although NASDI does not argue that Superior's claim for grade beam through pile cap, based on change order 41, is barred by the waivers, the Court fails to see how the waivers do not apply to that claim. The change order states that it was directed by NASDI, it was submitted before the waivers were signed, and Caruso testified that the claim accrued before the waivers were signed. "The law of New York states that where the language with respect to the parties' intent is clear and unambiguous, it will be given effect,

regardless of one party's claim that he intended something else. Here, the plain language of the [release] releases any and all claims not expressly reserved." *Kay-R Elec.*, 23 F.3d at 58–59 (internal citations, quotation marks, and alterations omitted). Therefore, the claims for open time and material change orders, pile cap and grade beam reports, and grade beam through pile cap are dismissed.

NASDI does not argue that the claims related to change orders 67-74 are barred by the waiver. Indeed, the evidence is unclear as to who directed the change. The change orders state that the City directed the change, but Caruso testified that NASDI instructed Superior to increase the PSI in the concrete. NASDI instead argues that Superior failed to comply with the notice requirements contained in the Superior Subcontract.

The Court finds that a question of fact exists because the October waiver includes a specific carve out for those claims related to extra work directed by the Owner. Although the waiver states that Superior would have to, *inter alia*, show that it is entitled to damages arising from those claims, it appears that the parties may have considered waiving the contractual notice requirements by including this clause in the waiver. *See Indus. Window*, 609 F. Supp. 2d at 342 ("New York courts routinely hold that 'the general course of conduct between the parties[ ] may modify or eliminate contract provisions requiring written authorization or notice of claims.'" (quoting *Barsotti's, Inc. v. Consolidated Edison Co.,* 254 A.D.2d 211, 212, 680 N.Y.S.2d 88 (1st Dep't 1998))). That is, by stating that Superior was not waiving its claims related to extra work directed by the City, NASDI and Superior may have deemed it unnecessary for Superior to comply with the notice requirements of the Superior Subcontract.

Therefore, Superior's claim for open concrete PSI upgrade change orders survives. Accordingly, NASDI's motion to dismiss that claim is denied.

Finally, as to Superior's claims related to the installation of rebar on the parking lot and on the slab on grade, the Court finds that they are barred. These claims are not related to extra work done by Superior, but instead are based upon an alleged agreement of which there is no evidence. Caruso testified that he and NASDI entered into an agreement regarding sharing the profits accrued by subcontracting the work. However, he said that the agreement was reduced to writing. No such agreement was provided to the Court. To the extent that Superior would seek to rely on an oral agreement, it is unable to do so because it has only plead claims for breach of written contracts. (*See* Compl. ¶¶ 75–81 (stating that Superior's claims are based solely on the Superior Subcontract and the change orders)).

Even if the Court were to read the Plaintiffs' memorandum of law broadly to include a request to amend their complaint to include a breach of an oral contract, it is clear that such a request at this juncture is improper. It is well settled that a party may not amend its pleadings in its briefing papers, including in a memorandum in opposition to summary judgment. *See Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) (summary order) ("The district court did not err in disregarding allegations Avillan raised for the first time in response to Potter's summary judgment motion." (internal citation omitted)); *Shah v. Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007) (summary order) (holding that "[a] party may not use his or her opposition to a dispositive motion as a means to amend the complaint" (internal citation omitted)); *Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir. 1998) (recognizing that a party may not use opposition to a dispositive motion as a means to amend the complaint); *Mediavilla v. City of New York*, 259 F. Supp. 3d 82, 106 (S.D.N.Y. 2016) ("Because this theory of excessive force is raised for the first time in Plaintiff's opposition to Defendants' motion for summary judgment, I need not consider it here. It is well settled that a litigant may not raise new claims not contained in the

complaint in opposition to a motion for summary judgment." (internal citations and footnote omitted)), *reconsideration denied*, No. 14-CV-8624 (VSB), 2017 WL 4155401 (S.D.N.Y. Sept. 18, 2017); *Wright v. Jewish Child Care Ass'n of N.Y.*, 68 F. Supp. 3d 520, 529 (S.D.N.Y. 2014) (holding that even *pro se* plaintiffs are not permitted to assert new claims in opposition to a motion for summary judgment); *Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 223 (S.D.N.Y. 2013) ("It is well settled that a party may not amend its pleadings in its briefing papers." (internal citations omitted)); *Bentley v. Providian Fin. Corp.*, No. 02 CIV.5714(WHP)(FM), 2003 WL 22234700, at *3 (S.D.N.Y. Apr. 21, 2003) ("Unfortunately, it is not appropriate to raise new claims for the first time in submissions in opposition to summary judgment." (internal citations and quotation marks omitted)); *Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.,* 963 F. Supp. 1342, 1359 (S.D.N.Y. 1997) ("[Plaintiff] in effect is apparently attempting to add a claim never addressed, or even hinted at, in the complaint. Such a step is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a dispositive motion."). Therefore, Superior's claims for rebar parking lot and rebar slab on grade are dismissed.

Accordingly, NASDI's motion for summary judgment dismissing Superior's claims for extra work, change orders, and profit sharing is granted in part and denied in part. It is denied to the extent that a question of fact exists as to whether the parties' course of conduct waived the notice requirements related to extra work directed by the City. Therefore, Superior's claims for open PSI upgrade change orders survive. Superior's remaining claims for extra work, change orders, and profit sharing are dismissed because Superior waived those claims pursuant to the May and October 2012 Releases.

### iii.  As to Superior's Delay Claim

Superior contends that NASDI has to compensate Superior for any costs resulting from the delays in the Project, and failed to process Superior's delay claim in a timely fashion. NASDI states that it is not obligated to pay for any delays that it did not cause, and that it has fulfilled its obligations.

The law in New York State regarding delays is that:

> absent a contractual commitment to the contrary, a prime contractor is not responsible for delays that its subcontractor may incur unless those delays *are caused by some agency or circumstance under the prime contractor's direction or control*.  Contrary to Triangle's contention, there is simply no basis for concluding that a prime contractor—which often times lacks control over much of the work to be performed at a particular project—has *implicitly* agreed to assume responsibility for all delays that a subcontractor might experience—no matter what their cause.  If a subcontractor wants a prime contractor to be a guarantor of job performance, it should bargain for the inclusion in its subcontract of a provision to that effect.

*Triangle Sheet Metal Works, Inc. v. James H. Merritt & Co.*, 79 N.Y.2d 801, 802–03, 588 N.E.2d 69, 70 (N.Y. 1991) (internal citations omitted) (emphasis added).

While neither side addresses the clauses in their memoranda of law, clauses 10.2 and 10.5 create such a liquidating agreement.  They state that:

> 10.2    Subject to Subcontractor's giving notice and other information, NASDI shall take all reasonable steps to secure from the Owner, such contractual benefits that may be claimable on behalf of the Subcontractor. The Subcontractor shall in sufficient time afford NASDI all information and assistance that may be required to enable NASDI to claim such Contractual benefits.  *On receiving such Contractual benefits from the Owner, NASDI shall pass on to the Subcontractor such proportion thereof*, it being understood that in the case of any claim of the Subcontractor for any additional payment, NASDI's receipt of payment from the Owner shall be a condition precedent to NASDI's liability to the Subcontractor in respect of such claim.

> 10.5 NASDI shall represent the Subcontractor in its claims only to the extent of passing the claim on to the Owner and shall not be required to actively support such claims and the Subcontractor shall retain responsibility for the proofs and processing of the claims.   The Subcontractor shall reimburse NASDI all costs

incurred including attorneys' fees, in passing such claim on to Owner; the
Subcontractor shall not advance any frivolous or unsupported claims. *NASDI is
liable to Subcontractor with respect to claims* only to the extent that the Owner is
determined, by litigation or settlement, to be liable to NASDI.

(Def.'s Ex. I (emphasis added)).

"Under *Triangle,* a contractor may bring an action for delays damages against the owner

on behalf of a subcontractor if a provision in the subcontract permits the 'prime contractor to be

a guarantor of job performance,' often asserted as pass-through claims made pursuant to a

liquidating agreement." *William A. Gross Const. Assocs., Inc. v. Am. Manufacturers Mut. Ins.*

*Co.*, No. 07CIV10639(LAK)(AJP), 2009 WL 427280, at \*8–10 (S.D.N.Y. Feb. 23, 2009)

(quoting *Triangle Sheet*, 79 N.Y.2d at 802–03, 580 N.Y.S.2d at 172, 588 N.E.2d 69 (internal

footnote omitted)).

There are three elements to a valid liquidating agreement: " (1) the imposition of liability

upon a party for a third party's increased costs, thereby providing the first party with a basis for

legal action against the party at fault, (2) a liquidation of liability in the amount of the first

party's recovery against the party at fault, and (3) a provision for the pass-through of that

recovery to the third party." *Helena Assocs., LLC v. EFCO Corp.*, No. 06 CIV. 0861(PKL),

2008 WL 2117621, at \*9 (S.D.N.Y. May 14, 2008) (quoting *N. Moore St. Dev., LLC v.*

*Meltzer/Mandl Architects, P.C.,* 23 A.D.3d 27, 32, 799 N.Y.S.2d 485, 489 (1st Dep't 2005)).

Here, NASDI agreed that it was liable to Superior for any claims that Superior alleged

against the City; agreed to liquidate liability in the amount recovered; and agreed to pass the

recovery to Superior. On its face, clause 10.5 appears to be a valid liquidating agreement. *See*

*Schiavone Const. Co. v. Triborough Bridge & Tunnel Auth.*, 209 A.D.2d 598, 599–600, 619

N.Y.S.2d 117, 118 (2d Dep't 1994) ("The subcontract agreement was sufficient to establish a

'pass through' claim because it provided that the plaintiff liquidate its liability to the

subcontractors in such amounts as may be recovered against the defendants." (internal citations omitted); *see also Helena Assocs.*, 2008 WL 2117621, at *9 ("[T]o prove a valid liquidating agreement with KBF and Rose Associates, Helena must have (1) admitted and acknowledged liability to KBF and Rose Associates for certain damages arising out of the services provided by EFCO, (2) agreed to liquidate such liability in the amount it might recover on behalf of KBF and Rose Associates, and (3) obligated itself to pass through to KBF and Rose Associates the portion it might recover on behalf of KBF and Rose Associates." (internal citation omitted)).

Unlike claims for payment related to work done, as discussed below, where courts have held that "pay-when-paid" clauses are either invalid or set a reasonable period of time for subcontractors to be paid, pass-through or liquidating agreements are valid and do not contain such a requirement. *See id.* at *9 ("Liquidating agreements are often employed on construction projects to bridge gaps in privity and are recognized under New York law as a valid means of avoiding the duplicative lawsuits that would otherwise be necessary to ensure that cost overruns and delay damages are ultimately borne by the responsible party." (internal citations and quotation marks omitted)). As NASDI has not yet been paid for Superior's pass-through delay claim, Superior cannot be paid for any delays caused by the City. Therefore, NASDI is not liable to Superior at this time for any delays caused by the City.

However, the evidence shows that NASDI ordered Superior to demobilize, not the City. As Superior knew even before it mobilized that it would be delayed, it is unclear why NASDI had Superior mobilize and then demobilize. A trier of fact will have to determine how much, if any, of the delay was attributable to NASDI.

Further, while it appears that Superior was delayed because a previous subcontractor had incorrectly installed certain piles, it is not clear from the evidence what if any of that mistake was

attributable to NASDI. As stated above in the seminal New York State case, a prime contractor is responsible for delays that its subcontractor incurs if they are caused by some agency or circumstance under the prime contractor's direction or control. *Triangle Sheet*, 79 N.Y.2d at 802, 588 N.E.2d at 70 (internal citations omitted).

As to NASDI's claim that Superior failed to comply with a condition precedent by not notifying NASDI of the changes, the Court finds this argument unavailing. NASDI ordered the change in ordering NASDI to demobilize. Further, when Superior demobilized, it did not know when it would remobilize. Finally, as discussed above, the October waiver includes a carve-out for Superior's delay claims, which indicates that the parties may have deemed the notice requirement unnecessary for those claims.

Therefore, a question of fact exists as to whether NASDI caused any of Superior's delays, and as to whether NASDI is liable for those delays. Accordingly, NASDI's motion for summary judgment pursuant to Rule 56 dismissing that claim is denied.

### iv. As to Superior's Claim for Final Payment

NASDI contends that Superior's claim for final payment is premature because the work has not been deemed completed, the City has issued back charges against NASDI that relate to Superior's work, and NASDI has not yet been paid by the City. Superior argues that it has completed its work, and that the pay-when-paid clause is unenforceable. The Court finds that a question of fact exists as to whether Superior should receive its final payment.

As to Superior's final payment, the Superior Subcontract states that:

Final Payment shall be the unpaid balance of the Subcontract Amount, and shall become due when the Work described in this Subcontract is fully completed and performed in accordance with this Subcontract and the Prime Contract, and is satisfactory to and approved by Owner, Architect and NASDI. Payment of retention, reserved amounts and final payments shall be made to the

Subcontractor only upon NASDI's receipt of the corresponding payment from the Owner.

(Def.'s Ex. I ¶ 5.9).

The subcontract also states that:

> Payments otherwise due, either Progress Payments or Final Payment, may be withheld by NASDI on account of defective work not remedied, claims filed, reasonable evidence indicating probability of filing of claims, failure of Subcontractor to make payments properly to its Sub-subcontractors or for material or labor, or applicable taxes, fees and fringe benefits, or reasonable doubt that the Work can be completed for the balance then unpaid, damage to NASDI, other subcontractors, Owner or the public, reasonable belief that Subcontractor will be unable to maintain the Project schedule, evidence of financial difficulty or inability to fully perform this Subcontract, set-offs or back-charges for which, in NASDI's reasonable opinion, Subcontractor is or will be liable as a result of its performance of the Work, or for any other breach of this Subcontract. NASDI may offset against any sums due Subcontractor hereunder the amount of any obligations of Subcontractor to NASDI, whether or not arising out of this Subcontract. In any of the foregoing events, NASDI may, but shall not be obligated to, make payments directly to Sub-subcontractors.

(*Id.* ¶ 5.8).

In November of 2015, Caruso testified that Superior had performed its obligations under the Superior Subcontract. (Def.'s Ex. C at 272). The Plaintiffs contend that Superior is owed over $400,000 pursuant to the Subcontract and change orders, but have not introduced any evidence in support of that contention.

Battistoni stated in his affidavit that "Superior may have purportedly 'completed' its work relatively early . . . ." (Battistoni Aff. ¶ 56). As NASDI points out, there is no evidence that NASDI or the Architect or the City have certified the work as complete. The City has apparently also issued back charges against NASDI related to Superior's work that total $400,506. (*See* Battistoni Aff. ¶ 57; Def.'s Ex. P).

First, the Court finds that clause 5.9 of the Superior Subcontract does not create a condition precedent to Superior's payment, but instead fixes a time for payment. The seminal

case on the construction of so-called "pay-when-paid" clauses, *Schuler-Haas Elec. Corp. v. Aetna Cas. & Sur. Co.*, 49 A.D.2d 60, 371 N.Y.S.2d 207 (4th Dep't 1975), *aff'd sub nom. Schuler-Haas Elec. Co. v. Aetna Cas. & Sur. Co.*, 40 N.Y.2d 883, 357 N.E.2d 1003 (N.Y. 1976) summarized the law in New York as follows:

> if the parties clearly expressed an intention that no subcontractor . . . should have the right to be paid or to sue on the payment bond until all questions relating to the contracts have been resolved and the owner has made his final payment due under the contract to the general contractor, such agreement would be binding, and it would constitute a condition precedent to [a subcontractor's] action against the surety.

*Id.* at 64, 371 N.Y.S. at 210. However:

> In the absence of a clear expression in the contract papers that the credit risk of the general contractor and the delay in payment frequently attending on construction projects are meant to be shifted to such suppliers and subcontractors, the contract instruments should not be construed as intending such assumption. Indeed, it is presumed that the parties did not intend that payment of the small subcontractors should await the determination of an extended legal dispute between the owner and general contractor over an issue not concerning him or his work.

*Id.* In affirming the decision by the Fourth Department in favor of the subcontractor, the New York State Court of Appeals held:

> If as here there is no express language to the contrary in the written document (and no extrinsic evidence), the standard would seem to be that where payment is stipulated to occur on an event, the occurrence of the event fixes only the time for payment; it is not to be imported as a substantive condition of the legal responsibility to pay.

*Schuler-Haas*, 40 N.Y.2d at 885, 357 N.E.2d at 1003.

Therefore, clauses relating to payment and risk must be carefully analyzed to determine whether the contractor and the subcontractor have clearly agreed to transfer the risk of non-payment to the subcontractor, or whether the language is ambiguous. Federal courts have found that clauses that provide that the subcontractor will be paid after the contractor is paid by the

owner have been held to fix a time for payment rather than create a condition precedent to payment. *See Nouveau Indus. Inc. v. Liberty Mut. Ins. Co.*, No. 08 CIV. 10408 CM, 2011 WL 10901796, at *9 (S.D.N.Y. Sept. 7, 2011).

To that end, clauses that merely fix a time for payment have been construed to only allow for a reasonable period of time after the completion of the subcontractor's work. *Conviron Controlled Environments, Inc. v. Arch Ins. Co.*, No. 14-CV-2030(ADS)(SIL), 2015 WL 12556060, at *6 (E.D.N.Y. Nov. 13, 2015) (Spatt, J.) (quoting *Nouveau Indus.*, 2011 WL 10901796, at *9); *see also Power Partners MasTec, LLC v. Premier Power Renewable Energy, Inc.*, No. 14CV8420, 2015 WL 774714, at *2 (S.D.N.Y. Feb. 20, 2015) (confirming arbitration award where "[t]he Arbitrator [] determined that the 'pay-when-paid' clause did not excuse Premier Power from its obligation to pay MasTec. The Arbitrator determined that a 'pay-when-paid' clause affords a general contractor a 'reasonable' time to pay a subcontractor and that 'three years was an unreasonable period of time to withhold payment from MasTec for its completed work.'" (internal citations to the record and alterations omitted)); *Hatzel & Buehler, Inc. v. Lovisa Const. Co.*, No. CV-92-384, 1993 WL 276971, at *3 (E.D.N.Y. July 20, 1993) ("It is clear that clauses that merely provide that the subcontractor will be paid after the owner pays the general contractor do not create a condition precedent to payment of the subcontractor. They are construed as allowing the general contractor to postpone payment to the subcontractor *for a reasonable period of time after* the completion of the subcontract work." (emphasis added) (collecting cases)); *Action Interiors, Inc. v. Component Assembly Systems, Inc.,* 535 N.Y.S.2d 55, 56 (2d Dep't 1988) (stating that a provision providing that payment to subcontractor was not due until the owner paid the general contractor, "while providing for a postponement of payment to permit the general contractor an opportunity to obtain funds from the owner, only requires that

payment be delayed for a reasonable time after completion of the subcontract work." (internal citations omitted)); *Schuler-Haas*, 49 A.D.2d at 64, 371 N.Y.S.2d at 210 ("[C]ourts have recognized that as a practical matter the suppliers and small contractors on large construction projects need reasonably prompt payment for their work and materials in order for them to remain solvent and stay in business.").

*Conviron*, a case previously decided by this Court, is almost directly on point. In that case, the plaintiff sought, *inter alia*, the balance of its payment. The provision of the contract in *Conviron* which dealt with final payment stated:

> after the completion of all the work Framan shall give written notice to the Owner and the Consultant that all the work is ready for inspection and final acceptance. The Owner and the Consultant shall promptly make such inspection and, if they shall determine that all the work has been satisfactorily completed, the Owner shall thereupon by written notice advise Framan that it accepts such work.

2015 WL 12556060 at *6 (internal alterations omitted). The Court held that the provision was insufficient to defeat the plaintiff's motion for summary judgment for final payment because "[f]ederal courts within this Circuit have recognized that such contractual clauses, which merely fix the time for payment to a subcontractor, are construed as allowing the general contractor to postpone payment to the subcontractor only for a *reasonable period of time* after the completion of the subcontract work." *Id.* (internal citation and quotation marks omitted) (emphasis in original).

Therefore, clause 5.9 of the Superior Subcontract does not create a condition precedent to Superior's payment, but instead fixes a time, for a reasonable period of time, for Superior to receive payment. As at least three years have passed since Superior completed its work, NASDI cannot rely on that clause in support of its motion for summary judgment. A reasonable period of time has long since passed.

However, NASDI contends that clause 5.2 of the Superior Subcontract does clearly transfer the risk of non-payment to Superior. Again, the Court disagrees. Instead of clearly transferring the risk of non-payment to Superior where defective work is allegedly the fault of Superior, clause 5.2 merely states that payments to the subcontractor "may be withheld by NASDI." (Def.'s Ex. I ¶ 5.2). The Court finds that such a vague, permissive statement does not support NASDI's motion for summary judgment. It is not clear from clause 5.2 that NASDI will withhold any payments that are deemed the fault of NASDI; instead, as the wording of the clause states, NASDI may withhold payments. As was the case with clause 5.9, such a statement merely fixes a reasonable period of time for Superior to receive its payment. Despite NASDI's evidence that the City has issued back charges against it related to NASDI's work, the Superior Subcontract does not clearly state that such money *must be* withheld from Superior.

Therefore, there is a question of fact as to whether Superior should receive its final payment. Accordingly, NASDI's motion for summary judgment on Superior's claim for final payment is denied.

## III. CONCLUSION

For the above stated reasons, NASDI's motion for summary judgment pursuant to Rule 56 dismissing the second amended complaint is granted in part, and denied in part. It is granted to the extent that all of Harrison's and Diversified's claims are dismissed, as are Superior's claims for specific charges, and all claims for extra work, change orders, and profit sharing except for those related to the extra work for open concrete PSI upgrade change orders. It is denied to the extent that Superior's delay claim and claim for final payment survive.

It is **SO ORDERED:**

Dated: Central Islip, New York

     August 3, 2018

                                _*/s/ Arthur D. Spatt*___

                                ARTHUR D. SPATT

                                United States District Judge